## UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ASPIRA, INC. OF PENNSYLVANIA,<br><br>          Plaintiff,<br><br>v.<br><br>THE SCHOOL DISTRICT OF PHILADELPHIA,<br><br>          Defendant. | Civ. A. No. 19-04415-JS |

## ASPIRA, INC. OF PENNSYLVANIA'S
## FIRST AMENDED COMPLAINT

Plaintiff, ASPIRA, Inc. of Pennsylvania ("ASPIRA") files this First Amended Complaint[1] against Defendant the School District of Philadelphia (the "District) for breach of contract and violations of ASPIRA's due process rights. In support, ASPIRA avers:

## I.      Introduction

1.      ASPIRA is the largest Latino-run charter management organization in Pennsylvania. It is a tremendous success story—a Latino success story, an education success story, and a Philadelphia success story in some of the poorest neighborhoods in America. So are its charter schools. Four of ASPIRA's charter schools are subject to the District's oversight: John B. Stetson Charter School ("Stetson"); Olney Charter High School ("Olney"), which was formed by consolidating the former Olney East

---

[1]      ASPIRA commenced this action in the Philadelphia Court of Common Pleas on September 13, 2019. The District then removed the action to this Court.

High School with the former Olney West High School; Eugenio Maria de Hostos Charter School ("Hostos"); and Antonia Pantoja Charter School ("Pantoja").

2.      In 2010 and 2011, under the District's Renaissance Schools Initiative and in response to a public bidding process initiated by the District, ASPIRA took over three failing, out-of-control schools—John B. Stetson Middle School, Olney East High School, and Olney West High School. The District had run these schools terribly, and the Pennsylvania Department of Education consistently named them among the most "persistently dangerous" in the Commonwealth. The Renaissance Schools Initiative is a unique structure and relationship created by the District. The District wanted experienced charter school operators to serve as "Turnaround Teams" to oversee and manage extremely distressed schools. The District agreed to have ASPIRA, an experienced charter school operator, be a Turnaround Team and specifically, the Turnaround Team for Stetson and Olney. Since taking over Stetson and Olney, ASPIRA has turned them around and put the schools on a positive trajectory, consistent with ASPIRA's long history of success and its Spanish name, which means "aspire."

3.      Likewise, Hostos and Pantoja, which were founded in the first instance by ASPIRA, have been tremendously successful.

4.      One powerful testament to the success of ASPIRA's schools has been their incredible enrollment growth as parents and students have recognized ASPIRA's successes.

5.      However, it is no secret that charter schools and charter management organizations compete with local school districts, like Philadelphia's. Every student who enrolls in a charter school is one fewer student enrolled in the District and that reduces revenue to the District. And, while school districts have the power to grant, renew, and not renew charters for schools (subject to standards), school districts inherently are conflicted in making such determinations. For these reasons, vigilance in ensuring that school districts respect and adhere to the due process rights of charter schools and charter management organizations is crucial.

6.      Pennsylvania law expressly addresses this concern that a local district might act biased toward charter schools and subvert the choices of students, parents, and communities. Thus, a state agency, the Charters Appeals Board (CAB), reviews any appeal from a denial of a charter or a charter renewal. The CAB has the authority to overrule a local district and grant a charter or the renewal of a charter, although its review primarily is based upon the record created by the local district.[2]

7.      The District has been dissatisfied with the composition of the CAB because it is populated by appointees from Pennsylvania's former Governor, the

---

[2]     "[J]urisdiction over an appeal of any other action by the District involving a charter school is appealable under the local agency law to the Court of Common Pleas of the county in which the District is located." *Northside Urban Pathways Charter Sch. v. State Charter Sch. Appeal Bd.*, 56 A.3d 80, 90–91 (Pa. Commw. Ct. 2012) (Pellegrini, J., dissenting); *see also Discovery Charter Sch. v. Sch. Dist. of Philadelphia*, 641 Pa. 136, 163, 166 A.3d 304, 321 (2017) (approving of Judge Pellegrini's dissent in *Northside Urban Pathways Charter School*). ASPIRA originally filed this action in the Philadelphia Court of Common Pleas, and the Defendant removed the action to this Court.

Honorable Thomas W. Corbett, Jr. So, the District has developed a policy and practice of delaying and refusing to issue final decisions on charter applications and renewals, thus denying any aggrieved party the right to review by the CAB and enabling the District to avoid scrutiny and the possibility that the CAB might grant or renew a charter that the District does not want. Then, using the extreme leverage created by holding a charter hostage, the District often tries to force applicants to cave to the District and "agree" to conditions upon charters and renewals that the District could not otherwise impose unilaterally (*e.g.*, unlawful enrollment caps). This "tactic" has been successful for the District and "mostly kept Philadelphia away from the Charter Appeal Board" in recent years. *See, e.g.*, Greg Windle, *School leaders in Philly and Pittsburgh frustrated with Corbett-era holdovers on state charter board*, THE PHILADELPHIA PUBLIC SCHOOL NOTEBOOK (April 9, 2019), *available at* https://whyy.org/articles/school-leaders-in-philly-and-pittsburgh-frustrated-with-corbett-era-holdovers-on-state-board/ (last accessed October 21, 2019).

8.    But the District's "tactics" are unlawful and must be stopped. The District attempts to excuse its conduct as no big deal and nothing to cry about. The District claims that schools and management organizations are not harmed because a charter automatically renews for a one-year period whenever a district fails to render a final decision by a certain deadline.

9.    Contrary to the District's dismissive attitude toward the rights of schools and charter management organizations—not to mention students, parents, and communities—they are harmed greatly by the District's conduct. First, it denies

4

aggrieved parties the right to obtain review by the state agency. Second, proceeding without a renewal creates a limbo that complicates day-to-day management decisions and cripples most charter schools' ability to obtain outside financing. Such financing often is critical to charters and charter management organizations. The standard five-year period of a formal and final renewal (whether granted by a district or by the CAB on appeal) provides much greater certainty, strength, and health, including a greater sense of permanency and greater ability to obtain more advantageous financing. Third, the uncertainty over the long-term status of charters forces schools and management organizations into states of duress. They are faced with the choice of trying to survive on a shaky foundation until the District finally acts (if it ever does), caving to conditions demanded by the District in exchange for a renewal, or surrendering their charter to the District and ceasing running the school.

10.     This is precisely the predicament ASPIRA has suffered and continues to experience now as the District has run roughshod over ASPIRA's contract and due process rights for years. The District's unlawful conduct began while it was controlled by the School Reform Commission ("SRC") and has continued since the District was returned to local control under the Philadelphia Board of Education ("Board") in 2018. Indeed, the hope that came from return to local control has been laid to rest as the Board has, in all material respects, continued to act identically to the SRC. And it is increasingly clear that the District has had ulterior motives adverse to ASPIRA that have little to do with the performance of ASPIRA's schools.

11.    In particular, the District unlawfully has delayed the renewal applications for the charters of Stetson, Olney, Hostos, and Pantoja. The application to renew Stetson's charter has been pending since October 2014, Olney's since October 2015, and Hostos' and Pantoja's applications have been pending since October 2017.

12.    All four charters expired before this litigation without any final, formal action by the District. Stetson's charter expired on June 30, 2015, Olney's on June 30, 2016, and Hostos' and Pantoja's expired on June 30, 2018. By law, because of that lack of final action, the schools have remained in operation, under ASPIRA's management, and continued to educate many of Philadelphia's most challenged and under-served children and youth. 24 Pa. Stat. Ann. § 17-1729-A(f). However, as detailed in this Amended Complaint, the extreme delays in formally renewing their charters has put ASPIRA and the schools in limbo and caused numerous difficulties and financial damages to ASPIRA in excess of $5,000,000. Despite that ongoing harm and the District's wrongful conduct, ASPIRA and its schools have made dramatic improvements in academics, governance, and finance. Indeed, ASPIRA and the schools it manages closed the fiscal year ending June 30, 2019 in the best financial condition in their history.

13.    In addition to the extreme and harmful delays, since 2015, the District has subjected Stetson and Olney to a charade of a formal non-renewal process. The process has been interminably long and fraught with repeated breaches of ASPIRA's contract and due process rights. For example, the District has repeatedly excluded

6

ASPIRA from participating in the District's non-renewal proceedings regarding the Stetson and Olney charters. Making ASPIRA's exclusion even more egregious, those non-renewal proceedings focused heavily on ASPIRA itself. On October 17, 2019, after years of delays (and after this litigation commenced), the District finally voted upon Stetson's and Olney's applications for renewal and voted to deny them. As set forth in detail in this Amended Complaint, that vote rests upon and is a continuation of an extended list of due process violations and breaches of contract.

14.     With respect to Hostos and Pantoja, even the District's Charter School Office ("CSO") recommended that the District renew Hostos' and Pantoja's charters. But the District has refused to renew those charters because ASPIRA, Hostos, and Pantoja rightfully have resisted the District's illegal demands to impose caps on the schools' enrollment.

15.     The District has taken a path of maximum delay and damage to ASPIRA and to the schools it manages. The District has denied and denies ASPIRA's contractual rights as a Turnaround Team for Renaissance Schools, has violated ASPIRA's substantive and due process rights, has forced ASPIRA to expend or lose millions of dollars in financing, forbearance, and other expenses, and is damaging ASPIRA's name and reputation. More specifically, among other wrongful acts, the District has: (a) unfairly and unwarrantedly delayed the renewals of the charters of four ASPIRA-managed schools; (b) denied ASPIRA the right to participate in the formal non-renewal proceedings against Stetson and Olney despite the proceedings being adverse to ASPIRA's rights and mostly concerning ASPIRA's direct actions and

7

conduct; (c) denied ASPIRA formal and fair notice of the non-renewal proceedings; (d) refused to sufficiently separate the prosecutorial and adjudicatory functions of the District in the non-renewal proceedings; (e) appointed a hearing officer with conflicts of interest; (f) haphazardly slowed and sped up the non-renewal process—moving at a glacial pace for years to the detriment of ASPIRA and its schools only to then use the excuse of a supposed lack of time in order to deny ASPIRA the opportunity to participate and to deny ASPIRA and the schools a fair opportunity to create a fair and balanced record; (g) demanded the exaction of unlawful concessions, such as enrollment caps on ASPIRA's schools, under the duress and penalty of charter non-renewal; and (h) sought to deny ASPIRA its right to practice its chosen profession as a charter management organization.

16.     Through all of the District's bad conduct—under the SRC and under the Board—ASPIRA has persevered. It has fought to maintain its contract and due process rights, and it has pleaded with the District to afford ASPIRA a process consistent with the United States and Pennsylvania Constitutions and ASPIRA's contract rights. The District has refused.

17.     ASPIRA now requests that this Court enjoin the District from further violations of ASPIRA's rights and require the District to afford to charter management organizations and charter schools a process of proper and adequate procedures and safeguards consistent with due process.

## II.    The Parties

18.    The ASPIRA Association is the largest nonprofit organization dedicated to Hispanic education in the nation, with nine affiliate groups, including Plaintiff.

19.    Plaintiff ASPIRA was formed in 1969, bringing the same dedication to education and youth empowerment to an entirely new area.

20.    ASPIRA's present address is 4322 N. 5th Street, Philadelphia, PA 19140.

21.    ASPIRA began its work as a charter management organization in 1998 when it founded Eugenio Maria de Hostos Charter School. Today, ASPIRA is the largest Latino-led charter management organization in Pennsylvania and one of the few in the country.

22.    ASPIRA manages five charter schools, including Stetson, Olney, Hostos, Pantoja, and a cyber charter school. All but the cyber charter school are subject to the District's jurisdiction. Each school is a separate nonprofit entity and managed by a board of directors separate from ASPIRA.

23.    ASPIRA operates primarily in North Philadelphia communities like Hunting Park, Olney, and Kensington. As some of Philadelphia's and the nation's most impoverished areas, these neighborhoods face huge socioeconomic challenges, such as high levels of crime, poor public health, and a range of other issues that burden children and families.

24.    ASPIRA believes that education is the most fundamental determinant in the mission to inspire growth and improvement in future generations and that

with the right attitude, knowledge, and resources, every member of these communities has the potential to become a leader for good. ASPIRA is proud to have tremendous support from key stakeholders in these neighborhoods.

25.     For thirty-five years before opening its first charter school, ASPIRA ran highly acclaimed education development and leadership programs that continue today. ASPIRA opened its first charter school because the District was failing to educate Latino students, especially bilingual children. Today, ASPIRA educates fifteen percent of all Latino students in Philadelphia as part of its "cradle to career" approach. The schools ASPIRA manages ascribe to the same principles.

26.     Defendant District is the eighth largest school district in the nation. The District is supposed to provide the children and youth of Philadelphia with a suitable public school education.

27.     Its offices are located at 440 North Broad Street, Philadelphia, PA 19130.

28.     From 2001 to June 30, 2018, the District was controlled by the SRC, a state and local board of five individuals, created by the Secretary of Education of the Commonwealth of Pennsylvania under Section 6-696 of the School Code, 24 P.S. § 6-696, as amended by Act 2001, Oct. 30, P.L. 828, No. 83 ("Act 83").

29.     The SRC was responsible for the operation, management, and educational program of the District, was vested with all powers and duties granted to the board of school directors of the District, and was authorized, among other things, to grant charters and to enter into agreements for the operation of charter

10

schools in accordance with the Charter School Law, 24 P.S. § 17-1701-A, *et seq.* (the "Charter School Law") and Act 83.

30.     The SRC voted to dissolve as of June 30, 2018, returning control of the District to the Board.

31.     The Board is the current governing body for the District with offices also located at the District's headquarters at 440 North Broad Street, Philadelphia, PA 19130.

32.     The Board currently is made up of nine members appointed by the Mayor of Philadelphia. As a result of a ballot question during the May 2018 Philadelphia election, the members appointed by the Mayor now require confirmation by City Council.

33.     Individual Board members are not yet named defendants, but ASPIRA reserves all rights to amend to add them as appropriate.

### III.   Jurisdiction and Venue

34.     This action arises under the Constitution of the United States, particularly the Fourteenth Amendment, the Constitution of Pennsylvania, particularly Article I, Section 1, and federal law, specifically title 42 U.S.C. § 1983.

35.     ASPIRA commenced this action in the Philadelphia County Court of Common Pleas, and the District removed it to this Court under 28 U.S.C. § 1441.

36.     Venue is proper in this judicial district because, among other reasons, Defendant is located in Philadelphia County, which is in this judicial district, and a

substantial part of the events giving rise to the claims in this Amended Complaint occurred in Philadelphia County. 28 U.S.C. § 1391(b)(1) & (2).

## IV.    Factual Background

###    A.    In Response to RFPs, ASPIRA is Awarded a Turnaround Team Contract and Charged with Managing Two Charter Schools at Stetson and Olney

37.    On or about January 20, 2010, through Resolution No. SRC-36 ("SRC-36"), the SRC adopted the Renaissance Schools Initiative Policy, authorizing the SRC to grant Renaissance charters.

38.    In 2010, the SRC issued Request for Proposal No. 260 ("RFP-260"), seeking respondents to serve as "turnaround teams" to run certain Renaissance Schools.

39.    A true and correct copy of RFP-260 is attached as Exhibit A.

40.    RFP-260 described the Renaissance Schools as follows:

> The Renaissance Schools initiative is articulated in the School District's **"Imagine 2014"** strategic plan and is predicated on the belief that the School District has chronically underperforming schools that are not serving the needs of students and families, and that these schools need fundamental change that facilitates a transformation of the learning environment. With an urgency to dramatically improve the learning environment in these underperforming schools, the School District is seeking innovative ways to transform low-performing schools through new school models that include: in-district restructuring (*Innovation Schools and Promise Academies*) and external partnerships (*Contract Schools and Charter Schools*).

RFP-260 at 7.

41.    Renaissance Schools were to "be granted greater degrees of autonomy in school management in exchange for accountability for performance." *Id.*

12

42.     The District had required that all respondents to RFP-260 be prequalified through RFQ 43 before being able to submit an application in response to RFP-260.

43.     To this day, the District's own website makes clear that the District sought "experienced charter school operators" for the purposes of the initiative. "Renaissance Charter Schools are those that are transformed under the leadership of an experienced charter school operator while operating under the Charter School Law."[3]

44.     ASPIRA, as an "experienced charter school operator," was prequalified by the District through RFQ 43 and the District identified ASPIRA as one of a final group of organizations to serve as a Turnaround Team for certain Renaissance Schools and the District solicited ASPIRA's response to RFP-260.

45.     RFP-260 stated: "By voluntarily submitting a proposal in response to this RFP, the responder acknowledges all of the terms, provisions and requirements of this RFP and agrees to abide by those terms, provisions and requirements with respect to the RFP process, the Turnaround Team selection process and in the responder's operation of any Renaissance School, if selected, regardless of the school model chosen." RFP-260 at 6.

---

[3]     Renaissance Schools, Charter Schools Office, The School District of Phila., *available at* https://www.philasd.org/charterschools/portal/renaissance/ (last accessed October 21, 2019).

13

46.    ASPIRA responded to RFP-260, agreed to be bound by the terms and conditions of the RFP, and applied to be a Turnaround Team for charter schools in the District.

47.    A true and correct copy of ASPIRA's response to RFP-260 is attached as Exhibit B.

48.    The District's selection process to determine awardees in response to RFP-260 was multi-stepped and extensive.

49.    Ultimately, the District awarded and named ASPIRA a Turnaround Team because of ASPIRA's response to RFP-260.

50.    The selection of ASPIRA as a Turnaround Team as a result of ASPIRA's response to RFP-260 formed a binding enforceable contract between ASPIRA and the District.

51.    By awarding ASPIRA as a Turnaround Team, the District and ASPIRA agreed that ASPIRA, as a "Renaissance School Turnaround Team," would be "responsible for all aspects of restructuring and managing the school awarded." RFP-260 at 5.

### 1.    The Stetson Charter

52.    The District designated Stetson as a Renaissance School.

53.    By Resolution No. SRC-26, dated May 12, 2010, the SRC selected ASPIRA as the Turnaround Team for Stetson.

54.    By Resolution SRC-45 ("SRC-45"), dated June 16, 2010, the SRC granted a charter to "John B. Stetson Charter School; an ASPIRA, Inc. of Pennsylvania

School," based upon the Renaissance Charter Schools Charter Application submitted by ASPIRA in response to RFP-260.

55.   A true and correct copy of Resolution SRC-45 is attached as Exhibit C.

56.   The selection of ASPIRA as a Turnaround Team for Stetson formed a binding enforceable contract between ASPIRA and the District.

57.   Effective July 1, 2010, the District and "John B. Stetson Charter School; and ASPIRA, Inc. of Pennsylvania School" entered into the "Charter for John B. Stetson Charter School; an ASPIRA, Inc. of Pennsylvania School," Contract No. 72/F11 ("Stetson Charter").

58.   A true and correct copy of the Stetson Charter is attached as Exhibit D.

59.   The Stetson Charter specifically references and incorporates ASPIRA's agreements with the District. For example:

   a. The Stetson Charter Recitals extensively reference ASPIRA's response to RFP-260, the award to ASPIRA that it would be a Turnaround Team, SRC-26 awarding ASPIRA as the Turnaround Team for Stetson, and SRC-45 awarding the Stetson Charter based upon ASPIRA's application.

   b. The Stetson Charter attaches RFP-260, ASPIRA's response to RFP-260, and SRC-45.

   c. The Stetson Charter additionally states that "Resolution No. SRC-45, dated June 16, 2010 is attached hereto as Exhibit C and made a part hereof," *id.*, art. I, ¶ A.

   d. The Stetson Charter specifically states that "The parties agree to the terms and conditions of this Charter and the Exhibits that are attached hereto and incorporated herein by reference." *Id.*, art. XVIII, ¶ I.

    e.  The Stetson Charter specifically states that "The Renaissance Charter Application and any amendments, including the representations, certifications and assurances set forth therein . . . is hereby incorporated in this Charter as if set forth herein in full." *Id.*, art. I, ¶ F.

    f.  All notices to be sent to the Charter School under the Stetson Charter specifically were to be sent to:

        Alfredo Calderon
        Chief Executive Officer
        ASPIRA, Inc. of Pennsylvania
        4322 North 5th Street, 3rd floor
        Philadelphia, PA 19140

        *See id.*, art. XVIII, ¶ M.

### 2.    The Olney Charter

60.    In November 2010, the District issued Request for Proposal No. 286, Renaissance Schools Initiative – Year II ("RFP-286").

61.    A true and correct copy of RFP-286 is attached as Exhibit E.

62.    In all respects relevant to this litigation, RFP-286 contains the same material terms as RFP-260.

63.    The District solicited a response by ASPIRA to RFP-286, and ASPIRA responded, agreed to be bound by the terms and conditions of the RFP, and applied to be a Turnaround Team for charter schools in the District.

64.    A true and correct copy of ASPIRA's response to RFP-286 is attached as Exhibit F.

65.    The District's selection process to determine awardees in response to RFP-286 was multi-stepped and extensive.

66.     The District selected ASPIRA to be a Turnaround Team as a result of its response to RFP-286.

67.     The selection of ASPIRA as a Turnaround Team as a result of ASPIRA's response to RFP-286 formed a binding enforceable contract between ASPIRA and the District.

68.     By Resolution No. SRC-26, dated May 16, 2011, and as a result of ASPIRA's response to RFP-286, the SRC selected ASPIRA as the Turnaround Team for Olney East High School and Olney West High School, which were combined to form Olney High School.

69.     The selection of ASPIRA as a Turnaround Team for Olney formed a binding enforceable contract between ASPIRA and the District.

70.     By Resolution SRC-_____ ("SRC-__"), the SRC granted a charter to Olney Charter High School; an ASPIRA, Inc. of Pennsylvania School, based upon the Renaissance Charter Schools Charter Application submitted by ASPIRA in responses to RFP-286. Copies of relevant documents provided by the District to ASPIRA does not identify SRC-___ by a formal number, but, upon information and belief, the District is in possession of such information.

71.     Effective as of July 1, 2011, the District, acting through the SRC, and "Olney Charter High School; an ASPIRA, Inc. of Pennsylvania School" entered into the "Charter for Onley [sic] Charter High School," ("Olney Charter").

72.     A true and correct copy of the Olney Charter is attached as Exhibit G.

17

73.     The Olney Charter specifically references and incorporates ASPIRA's agreements with the District. For example:

a.   The Olney Charter Recitals extensively reference ASPIRA's response to RFP-286, the award to ASPIRA that it would be a Turnaround Team, SRC-26 awarding ASPIRA as the Turnaround Team for Olney, and SRC-____ awarding the Olney Charter based upon ASPIRA's application.

b.   The Stetson Charter attaches SRC-286, ASPIRA's response to SRC-286, and SRC-____.

c.   The Olney Charter additionally states that SRC-____, dated August 17, 2011 is attached hereto as Exhibit C and made a part hereof," Olney Charter, art. I, ¶ A.

d.   The Olney Charter states that "The parties agree to the terms and conditions of this Charter and the Exhibits that are attached hereto and incorporated herein by reference." *Id.*, art. XVIII, ¶ I.

e.   The Olney Charter specifically states that "The Renaissance Charter Application and any amendments, including the representations, certifications and assurances set forth therein . . . is hereby incorporated in this Charter as if set forth herein in full." *Id.*, art. I, ¶ F.

f.   All notices to be sent to the Charter School under the Olney Charter specifically were to be sent to:

Alfredo Calderon
Olney High School
100 W. Duncannon Ave.
Philadelphia, PA 19120

*See* Olney Charter, art. XVIII, ¶ M.

74.     Alfredo Calderon is and was the Chief Executive Officer of ASPIRA during all times relevant to this Amended Complaint.

75.    Thus, the District reinforced through the Stetson Charter and Olney Charter what the RFPs, RFP responses, and resolutions already established: that the District and ASPIRA had a binding enforceable contract for ASPIRA to serve as a Turnaround Team and to serve as the Turnaround Team for Stetson and Olney.

76.    The parties agreed that ASPIRA could only be removed as the Turnaround Team for Stetson or Olney for cause.

77.    To the extent any ambiguities exist regarding the terms of the District's and ASPIRA's agreements, such ambiguities were created and/or written by the District.

### 3.    Olney and Stetson Thrive Under ASPIRA's Management

78.    The parties' course of conduct and course of performance further establishes that the District and ASPIRA have binding enforceable contracts for ASPIRA to serve as a Turnaround Team and to serve as the Turnaround Team for Stetson and Olney. The District literally handed the keys to the facilities for the schools to ASPIRA. And since ASPIRA was awarded as the Turnaround Team for Stetson and Olney, ASPIRA served as the primary point of contact for the District in all matters related to Stetson and Olney, including with respect to management of the facilities, exchanging information, and reporting requirements, and ASPIRA has in fact functioned as the Turnaround Team for Stetson and Olney in the manner contemplated by the RFP.

79.    ASPIRA has acted in reliance upon its status as a Turnaround Team and as the Turnaround Team for Stetson and Olney.

80.     The District has accepted the benefits of ASPIRA's actions as a Turnaround Team and as the Turnaround Team for Stetson and Olney, and has accepted, acquiesced to, and ratified the fact that it has a binding enforceable agreement with ASPIRA for ASPIRA to be a Turnaround Team and specifically for Stetson and Olney.

81.     ASPIRA has managed both Stetson and Olney since being named the Turnaround Team for each school.

82.     Under ASPIRA's management, Stetson and Olney have thrived as compared to their conditions and performance prior to ASPIRA's management and as compared to other peer schools.

83.     Before ASPIRA took over, the Pennsylvania Department of Education consistently designated Olney and Stetson as "persistently dangerous" schools recognized primarily for low attendance, ugly episodes of school violence, and dozens of student suspensions and police arrests.

84.     Today, the climate at both schools has undergone a remarkable change, and the academic results prove it.

85.     Both Stetson and Olney are safe and welcoming schools that enjoy significantly increased enrollment and strong daily attendance. Incidents, arrests, expulsions, and suspensions have decreased by 95%. Student academic performance has flourished as a result.

86.     In the year before ASPIRA management, 77 students were arrested at Olney East and Olney West High School and 30 were arrested at Stetson Middle. In

the year following the start of ASPIRA's management, there were zero arrests in each school. This drastic improvement occurred because ASPIRA invested in 45 trained security staff between the two buildings and imbedded on-staff behavioral, social, and emotional supports to begin to change the culture from the ground up.

87.     Olney's enrollment has increased by 25% in the last four years, rising to more than 1,900 students. Student attendance, once as low as 67%, tops 84%. This is significantly above average for a comprehensive high school of its size.

88.     Olney's growth also reflects the realities of the community it proudly serves: the English Language Learners (ELL) population has doubled from 300 to almost 600 over the last two years (29% of the overall population); and the special education population has gone from 300 to well over 500 students (approximately 27% of the entire student population).

89.     Despite these challenges, Olney's student growth has been significant, and today Olney meets or surpasses state expectations.

90.     For example, in the 2016–17 school year, Olney showed significant growth in both math and science as measured by state standards, particularly among the lowest 33% of its students, as well as students with Individualized Education Programs ("IEPs"). The growth for these students in 2017–18 for math and biology surpassed the average growth rate of the state two times over.

91.     The results also show that Olney is performing significantly better than its true peer schools, as measured by the District's Charter School Office. Across nearly all subjects and in attendance, Olney is performing better than the following

comprehensive high schools: Kensington, Kensington CAPA, Frankford, Benjamin Franklin, Edison, Martin Luther King, Roxborough, Fels, and The Linc.

92.     At the same time, under ASPIRA's management, Olney dramatically has increased the number and variety of programs and services it offers to students and the community, including: a comprehensive school sports program; multiple new extracurricular programs such as a debate team, Scrabble, robotics, and coding clubs; and a child care center for teenage parents so that the parents can complete their education.

93.     Olney's graduation rate pre-ASPIRA was a mere 56% and has since risen to nearly 72% despite the increase in population and off-track students.

94.     Stetson has shown similar progress, and once again, a very visible sign of its success has been its growth. Today, Stetson's student population has grown by more than 33% from its pre-ASPIRA enrollment, and the school now serves more than 900 children.

95.     Stetson's average daily attendance rate consistently is above 93%, which is significantly above average for a middle school of its size. Prior to ASPIRA's operation, it averaged 70–74% attendance daily.

96.     At the same time, Stetson's ELL population has increased from 15% of total enrollment to approximately 26% (or 276 ELL students), and the Special Education population has increased from 20% to 25% (or 252 students). These groups pose particular challenges for any school.

97.     Stetson has shown significant academic growth. During relevant school years, student scores in literacy and mathematics have exceeded the state average for growth, both among the entire population and specifically among the lowest 33% of learners and students. Across nearly all grades in both math and literacy, Stetson has surpassed the state average in the most recent years by a significant margin. Additionally, they were listed as a "Model" across the school for growth in math and literacy on the District's own rankings.

98.     While the increase in special needs and ELL students has impacted Stetson's proficiency scores on state assessments, the growth among these populations has met or surpassed state expectations. The students in this cohort have been rated as a "Model" for their progress on the District's progress report (SPR) for the last two years.

**B.      The      District's     Historic     and     Current     Procedures
for Reviewing Charters**

99.     School districts, including the District, compete with charter schools for student enrollment and funding.

100.    School districts, including the District, have an inherent conflict of interest when they decide to grant, renew, or non-renew a charter for a charter school.

101.    The District acts in competition with charter schools. Every student who chooses to attend a charter school is one fewer student in a District-run school and this causes a reduction in revenue for the District. Thus, the District is incentivized

to reduce the number of charter schools in Philadelphia and reduce the number of students attending charter schools.

102.   For these reasons, it is crucial that school districts, including the District, respect the due process rights of those subject to their control.

103.   Pennsylvania law provides that final decisions by school districts to deny an application for a charter or renewal are to be appealable to the CAB. The CAB may allow supplementation of the record, but the record before the CAB primarily is the record that was created before the local district.

104.   However, the District has a custom, policy, and practice of delaying final determinations on applications for charters and renewals. The District delays these determinations for bad faith purposes, including but not limited to avoiding review, denying aggrieved parties the right to appeal to and obtain review by the CAB, damaging charters and management organizations, forcing the surrender of charters, and obtaining concessions as conditions for the grant of a charter or renewal.

105.   The District has a custom, policy, and practice of acting in bad faith toward charter schools and charter management organizations in other manners by, among other things, unlawfully failing to grant charters, unlawfully denying applications for renewal of charters, unlawfully capping enrollment for charters, unlawfully demanding concessions such as enrollment caps as conditions for renewing charters, unlawfully failing to redirect to charter schools funds that the District legally is required to pay, and refusing to afford adequate due process procedures and protections for charters and charter management organizations.

24

106.   The District's CSO functions as the self-described "authorizer" of charter schools in the District. Its duties include "reviewing, evaluating and approving new charters, establishing performance goals for existing charter schools, regularly reviewing and evaluating charter school performance, conducting comprehensive renewal reviews, and sharing information about charter schools and their performance with the public." Charter Schools Office, The School District of Philadelphia, https://www.philasd.org/charterschools/about/ (last accessed October 21, 2019).

107.   To be clear, the CSO is not supposed to make the final decision as to whether a charter is renewed. It is only supposed to make a recommendation to the Board as to whether a charter is renewed.

108.   If the Board holds a hearing regarding the CSO's recommendation for the non-renewal of a charter, the CSO is supposed to act in an investigatory and prosecutorial capacity; the Board is supposed to act in an adjudicatory capacity.

109.   However, the Board does not in fact conduct an independent, rigorous analysis of the CSO's recommendations, and it does not maintain proper separation from the CSO.

110.   Rather than presiding over non-renewal hearings directly, the Board routinely hires private lawyers to function as hearing officers.

111.   The hearing officers then preside over hearings outside of the presence of the Board and ultimately issue reports and recommendations to the Board.

112.   Those private lawyers purport to make independent findings, but in fact, they routinely rubber-stamp the CSO recommendations. Indeed, ASPIRA is not aware of any instance in which a hearing officer did not follow a CSO's recommendation of non-renewal.

113.   In several instances, the same private lawyers have acted as the prosecutor in one non-renewal proceeding and as the hearing officer in another.

114.   Upon information and belief, the District's General Counsel acts as counsel to both the Board and the CSO. This is unlike other local or state agencies that have fully separate counsel for the enforcement and adjudicatory arms of the agency (e.g., Pennsylvania's Gaming Control Board) to help ensure that the enforcement and adjudicatory arms of a single agency do not exchange information and have inappropriate contacts with each other.

115.   The Board affords an inadequate to no opportunity for charters and charter management organizations to address the Board directly, whether it is at the time the CSO initially recommends that the Board commence non-renewal proceedings, during the non-renewal proceedings, or upon a report and recommendation from a hearing officer.

116.   Thus, although the District's overall process creates the appearance of multiple steps and apparent respect for the rights of charter schools, charter schools and charter management organizations effectively are denied the opportunity to address the Board and are at the mercy of the recommendation of the CSO.

117.    Upon information and belief, CSO staff, SRC members, Board members, and other District staff engage in inappropriate *ex parte* consultations with politicians and others during non-renewal proceedings.

118.    The same deficiencies in the District's processes were present while the SRC controlled the District and have continued with no material change since the Board took control of the District in 2018.

### C.    The District's Drawn-Out Campaign Against ASPIRA and the Schools

#### 1.    The CSO First Recommends Renewing Stetson's Charter But Then Reverses and Recommends Not Renewing Stetson's and Olney's Charters

119.    In October 2014, Stetson submitted an application to the CSO to renew its charter, well in advance of the charter expiration date of June 30, 2015.

120.    The renewal of Stetson's charter would continue and renew ASPIRA's status as a Turnaround Team for Stetson.

121.    On January 22, 2015, the CSO issued a report recommending that Stetson's Charter be granted a one-year renewal ("2015 Report").

122.    In October 2015, Olney submitted an application to the CSO to renew its charter, well in advance of the charter expiration date of June 30, 2016.

123.    The renewal of Olney's charter would continue and renew ASPIRA's status as a Turnaround Team for Olney.

124.    However, on April 11, 2016, the CSO issued reports recommending to the SRC that both the Stetson and Olney charters not be renewed ("2016 Reports").

125.    The 2016 Reports are based on the 2009–2010 to 2015–2016 school years for Stetson and 2010–2011 to 2015–2016 school years for Olney.

126.    The CSO provided no reasoning for the change of its recommendation regarding Stetson even though the 2016 Report regarding Stetson purported to evaluate most of the same years evaluated in the 2015 Report.

127.    The non-renewal of Stetson's charter would terminate ASPIRA's role and rights as Turnaround Team for Stetson.

128.    The non-renewal of Olney's charter would terminate ASPIRA's role and rights as Turnaround Team for Olney.

129.    The non-renewal of both charters would terminate ASPIRA's role and rights as Turnaround Team entirely.

### 2.    The CSO's Misleading and Incomplete Reports Focused Upon ASPIRA

130.    The 2016 Reports are misleading and contain inaccurate and incomplete information, including, among other things:

    a.    An inaccurate, incomplete, and misleading picture as to the academic progress made at the Schools;

    b.    An inaccurate, incomplete, and misleading picture as to the Schools' current financial state and management;

    c.    An inaccurate, incomplete, and misleading picture as to the Schools' compliance efforts; and

    d.    An inaccurate, incomplete, and misleading picture as to the Schools' climate, both before and after ASPIRA's involvement as operator.

131.    On December 8, 2017, the CSO issued updated reports ("2017 Reports"), purporting to provide updated information but maintaining the recommendation that the Stetson and Olney Charters not be renewed.

132.    The 2017 Reports contain similar inaccurate information as the 2016 Reports and were based on information related to the 2014–2015 to 2016–2017 school years for both Schools.

133.    The 2017 Reports omit the progress that the Schools have made on many of the specific issues identified in the 2016 and 2017 Reports.

134.    The 2017 Reports treat some past and resolved issues as ongoing, skewing the picture as to the reality of Stetson and Onley and ASPIRA's management at the time the 2017 Reports were issued.

135.    The 2017 Reports also omit key points and facts that would have presented a more accurate picture of the conditions of the Schools and ASPIRA's management. These omissions included:

    a.    The financial challenges imposed upon Stetson and Olney by the District during the charter periods;

        i.    The District caused substantial revenue reductions to Stetson and Olney, primarily by improper per pupil payment reductions.

ii.      In fact, Olney and Stetson were forced to seek redirection from the Pennsylvania Department of Education ("PDE") in the amounts of $953,981.46 and $438,743.52 respectively. PDE paid the amounts when the District was forced to withdraw its objections to the withholdings on January 9, 2019.

iii.     And in August 2019 the Commonwealth Court specifically recognized that Hostos and Pantoja also were underpaid by the District and that the "District remains obligated to resolve that underpayment." August 5, 2019 Memorandum Opinion, *Antonia Pantoja Charter School v. Commonwealth*, No. 289 M.D. 2017, at 27-28.

iv.      Even the Pennsylvania Auditor General recognized that the District was a substantial cause of Stetson's and Olney's past financial difficulties. *See* Pennsylvania Auditor General, *ASPIRA-Managed Charter Schools Limited Procedures Engagement* at 31-32 (2018) ("We also acknowledge that, in fiscal years 2015 and 2016, the belated tuition reductions levied by [the District] would have negatively impacted budget versus actual variances.").

b.     The fact that since the initial non-renewal recommendation and despite the District's unlawful withholding, Stetson and Olney have made dramatic improvements in their financial performances;

c.     The fact that independent auditors, the District, and the City Controller have audited the schools and there has been no finding of inappropriate spending;

d.     The fact that at no point has there been evidence of malfeasance, intentional wrongdoing, or self-dealing; and

e.     The fact that there have been no instances of unreasonable or excessive spending.

136.   The Reports also focus substantially on ASPIRA, alleging, among other things, that Stetson and Olney increased their payments to ASPIRA "exclusive of charter management fees." The Reports are wrong and mischaracterize the facts.

137.   To weather revenue cuts *imposed by the District*, ASPIRA centralized many administrative and instructional support functions that previously were paid by Stetson and Olney. These services and functions include education program management services, administrative and contracting services (including security and maintenance), nutrition services, IT, human resources and payroll, and financial management services.

138.   Centralizing these costly services at ASPIRA enabled ASPIRA's schools, including Olney and Stetson, to realize costs savings.

31

139.   Thus, although Stetson and Olney had increased payments to ASPIRA on one side of the ledger, those increases in payments mirrored or were exceeded by reductions in expenses for Stetson and Olney on the other side of the ledger.

140.   Contrary to the portrayal in the Reports, Stetson and Olney are trending in the correct direction and are properly managed by ASPIRA.

### 3. The CSO Presents Its Recommendation to the SRC and ASPIRA Is Denied Any Chance to Respond

141.   On December 14, 2017, the CSO presented its recommendations regarding Stetson and Olney to the SRC at a public meeting.

142.   The CSO's presentation to the SRC was misleading and did not present facts objectively.

143.   The CSO's presentations to the SRC omitted any consideration of any rebuttal points.

144.   By way of example only, the CSO focused much of its attention on ASPIRA's management "fee," and wrongly argued that ASPIRA was receiving an inordinately large fee from Stetson and Olney.

145.   The CSO repeatedly characterized payments to ASPIRA as a fee even though the CSO knew that most of the so-called "fee" was reimbursement for services that were paid by ASPIRA for the benefit of Stetson and Olney.

146.   The CSO complained of issues (or non-issues) about which the District was aware when it selected ASPIRA to manage Stetson and Olney. For example, the CSO complained about ASPIRA's (former) authority to appoint members to the Schools' boards, as if the CSO had discovered some sort of malfeasance. But the

32

District knew of that authority long ago. In fact, the District was provided with the bylaws of ASPIRA and Stetson and Olney, it knew that ASPIRA and Stetson and Olney relied on counsel when forming the charter schools, and it regularly reviewed and had access to Stetson's and Olney's records.

147.   By way of another example, the CSO criticized the relationship of Stetson and Olney to ASPIRA as being too close, when the District itself historically has treated them and ASPIRA as one entity.

148.   Throughout the presentation, the CSO continued to mislead the SRC into believing ASPIRA was receiving inordinately large management fees when it was not.

149.   During the December 14, 2017 meeting, the SRC members' and CSO's main stated concern was about certain transactions in which Stetson and Olney purportedly guaranteed debt that ASPIRA owed to PNC Bank (the "PNC Debt").

150.   The CSO presented a misleading and confusing description of the PNC Debt. Regardless, on June 27, 2019, the PNC Debt was satisfied through a replacement private funding transaction, and the purported guarantees provided by Stetson and Olney related to the PNC Debt were removed. Stetson and Olney now have no purported obligations. This replacement financial transaction also allows ASPIRA to contribute to Stetson and Olney and enhance each School's balance sheet.

151.   ASPIRA accomplished all of this despite the District's significant delays in determining Stetson's and Olney's charter renewals, which caused a significant

impediment to ASPIRA's ability to secure alternate and replacement financing on favorable terms.

152.    Compounding the violations of ASPIRA's rights, Stetson, Olney, and ASPIRA were denied an opportunity to meaningfully address the SRC at the December 14, 2017 meeting or otherwise.

153.    Prior to the December 14, 2017 meeting, ASPIRA's counsel requested the opportunity to address the SRC. The SRC denied his request and refused to allow ASPIRA's counsel to address the SRC.

154.    Thus, whereas the CSO provided the SRC with a lengthy, complex, and skewed report and presentation, ASPIRA had no opportunity to respond or participate.

155.    After hearing the CSO's presentations at the December 14, 2017 meeting, the SRC voted and resolved through SRC-8 and SRC-9 that substantial grounds for non-renewal of the Stetson and Olney charters existed, and that a public hearing(s) would be scheduled to determine the issue.

156.    From the date the SRC issued SRC-8 and SRC-9 on December 14, 2017 until the SRC's dissolution on June 30, 2018, the SRC never scheduled the hearing nor took any other action to proceed regarding the renewal applications for the Stetson and Olney charters.

> **4.    The District Refuses to Notify ASPIRA of the Scheduling of a Hearing and Refuses to Allow ASPIRA to Intervene Despite ASPIRA's Crucial Rights and Interests at Stake**

157.    The SRC voted to dissolve as of June 30, 2018.

158.    For over five months following the SRC's dissolution, the Board took no action regarding the Stetson and Olney renewal applications, further delaying the process.

159.    The extensive delays have continued under the Board's control, and even up until the commencement of this action, the District had not made a final decision regarding the charters for Stetson or Olney. As detailed in section D, *infra*, the District also unwarrantedly has delayed and refused to make a final decision regarding the renewal of the charters for Hostos and Pantoja.

160.    The District's lengthy and unjustified delays in refusing to renew the charters for the ASPIRA-managed schools constitute violations of ASPIRA's due process rights. And any subsequent process afforded or to be afforded to ASPIRA or its schools is insufficient to cure the breaches and due process violations already having occurred due to the delays.

161.    By letter dated December 5, 2018—nearly an entire year since the December 14, 2017 meeting—the Board's President, Joyce Wilkerson, appointed Rudolph Garcia, Esquire as a hearing officer to preside at a public hearing "concerning the non-renewal of the [Schools]."

162.    Wilkerson and at least one other member of the Board were members of the SRC during the time the SRC began the non-renewal process against Stetson and

Olney. As with the current Board, Wilkerson served as the Chair of the SRC during all times relevant to this Amended Complaint.

163.   Although not disclosed at the time of Wilkerson's letter, Garcia often has functioned as outside counsel to the District, including possibly during the same time he functioned as the appointed hearing officer presiding over the non-renewal hearing for Olney and Stetson.

164.   ASPIRA is not aware of any facts that Wilkerson or the Board obtained updated reports and recommendations or conducted any reviews or analysis independent of the SRC when the Board decided to schedule the non-renewal hearing. Instead, on information and belief, the Board merely relied on the determination of the SRC from December 14, 2017 that "there are substantial grounds for non-renewal" of both charters. The Board continued the same flawed process undertaken by the SRC and the District's CSO, albeit with additional substantial delays by the Board.

165.   ASPIRA is not aware of any facts that the Board formally ratified or otherwise adopted the SRC's determination. It also is unclear if the Board even has the authority to do so or act upon the SRC's determination given the stark differences between the SRC (a Commonwealth agency) and the Board (a local agency) and the different statutes, rules, and procedures governing them.

166.   In scheduling the non-renewal hearing and appointing a hearing officer, the District was required to comply with article XVIII, paragraph M of the Stetson Charter and article XVIII, paragraph M of the Olney Charter.

167.   Despite the express requirements of the Stetson Charter and the Olney Charter that the District provide notice to Alfredo Calderon and ASPIRA, the Board never provided notice to Mr. Calderon or ASPIRA regarding the appointment of the hearing officer and commencement of a non-renewal hearing.

168.   The start date of the hearing was postponed to March 12, 2019.

169.   After discovering that the hearing was scheduled (despite the District's lack of notice to or inclusion of ASPIRA), ASPIRA petitioned to intervene on March 1, 2019.

170.   By email dated March 7, 2019, the hearing officer denied ASPIRA's petition to intervene.

171.   A true and correct copy of the hearing officer's email decision is attached as Exhibit J-2.

172.   Among other things, the hearing officer's primary basis for denying ASPIRA's petition to intervene was the hearing officer's position that Part B of the Local Agency Law, which the hearing officer stated applied to the proceedings, does not even "provide for intervention of additional parties."

173.   However, the hearing officer's position plainly is contrary to Pennsylvania law and any notion of due process. Indeed, Section 553 of Part B of the Local Agency Law provides that "[n]o adjudication of a local agency shall be valid as to any party unless he shall have been afforded reasonable notice of a hearing and an opportunity to be heard." 2 Pa.C.S.A. § 553. This statute means that local agencies do have the "power to permit intervention by a party whose interests may be

affected." *Soc'y Hill Civic Ass'n v. Philadelphia Bd. of License & Inspection Review*, 905 A.2d 579, 585–86 (Pa. Commw. Ct. 2006) (holding that denying intervention "not only would contravene the general principle of intervention but also would result in depriving [the developer] of an opportunity to be heard as guaranteed by the Local Agency Law.")

174.   These proceedings were commenced by the SRC, a Commonwealth authority, and were continued by the Board, a local agency, without any ratification or reconsideration of the SRC's determinations. To the extent the hearing officer or the Board should have followed the General Rules of Administrative Practice and Procedure applicable to proceedings before a Commonwealth Agency, 1 Pa. Code §§ 35.27–35.32, ASPIRA still had a legal right to intervene. *See, e.g.*, *Bensalem Racing Ass'n, Inc. v. Pa. State Harness Racing Comm'n*, 19 A.3d 549, 561–563 (Commw. Ct. 2011) (finding Commonwealth agency committed abuse of discretion in denying intervention request).

175.   The hearing officer's alternative bases for denial also were without merit and demonstrated a bias by the hearing officer against ASPIRA. For example, the hearing officer stated that ASPIRA had notice of the hearing 29 days prior to submitting its petition to intervene and this period meant ASPIRA unnecessarily had delayed submitting its petition. However, 29 days is not a delay at all, and the hearing officer wrongly ignored that the District refused to provide the required notice to ASPIRA (and still has not) and the District had engaged in extensive delays throughout the proceedings, including in scheduling the hearing.

176.    Claiming a sudden urgency that the District had never before exhibited, the hearing officer also stated that he wanted the hearing and his ruling to be completed in time for the District to act prior to the following school year. The hearing officer was wrong to claim that ASPIRA's intervention would have meant that the proceedings could not be completed before the 2019–2020 school year. Even worse, despite using this excuse to unfairly and wrongly block ASPIRA's intervention, the hearing officer did not issue his reports regarding the Stetson and Olney hearings until September 19, 2019 (approximately one week after ASPIRA commenced this lawsuit).

177.    The hearing occurred over 16 days during March 12, 2019 to April 15, 2019, without ever providing an opportunity to ASPIRA to present evidence, testimony, or argument.

178.    The hearing officer's determination (and thus, the District's determination) to exclude ASPIRA from the hearing was unfair, inequitable, a breach of contract, and a violation of ASPIRA's due process rights.

179.    Fair and just adjudication of the issues concerning the renewal of Stetson's and Olney's charters was and is impossible without ASPIRA being a party to the proceedings.

180.    The hearing concerned and was adverse to ASPIRA's contractual rights, liberty interests, and property interests.

181.    The non-renewal of either or both of the Stetson and Olney Charters would strip ASPIRA of its contractual rights, property interests, and liberty interests

as a Turnaround Team, as a Turnaround Team specifically for Stetson and Olney, and as a management organization for the respective charters.

182.   ASPIRA's role and conduct as the Turnaround Team and management organization for Stetson and Olney was a core substantive issue in the notices of non-renewal of the charters and the hearing, and factual determinations regarding ASPIRA's role as the management company could greatly impact ASPIRA's rights, business, and reputation.

183.   Indeed, the relationship of Olney and Stetson to ASPIRA is precisely the reason the District combined the non-renewal hearing for Olney's charter with the non-renewal hearing for Stetson's charter. Yet, the District still denied ASPIRA its right to notice of and participate in the non-renewal proceedings.

184.   The SRC's resolutions to move forward with non-renewal proceedings are filled with references to ASPIRA. They question ASPIRA's purported conduct as to Stetson and Olney and its general operations and the other schools it manages.

185.   Among other things, the SRC resolutions allege that:

   a.   Board meetings for all ASPIRA-managed charter schools are held concurrently with specific business or approvals by individual charter school not clearly delineated.

   b.   In addition to school employees, ASPIRA employees made school purchases without specific approval and oversight processes.

   c.   Transactions between ASPIRA and the Schools were not properly documented and/or were otherwise improper.

40

d. ASPIRA owed the Schools significant amounts of money, and the Schools owed money to other ASPIRA schools.

e. ASPIRA increased the amounts of money charged to the Schools.

f. The Schools were not financially independent from ASPIRA and were obligated to secure the debts of other ASPIRA-managed or ASPIRA-affiliated entities.

186. ASPIRA has the right to defend itself, its conduct, its reputation, and its ability to practice its chosen business as a charter management organization, and the schools it manages, but the District wrongfully denied ASPIRA such rights in violation of both ASPIRA's contract rights and due process rights, and ASPIRA has been damaged by the District's conduct.

187. The exclusion of ASPIRA from the charter non-renewal proceedings infects the entire non-renewal process and permanently taints any action by the hearing officer or the District following the hearing.

### 5. The Slanted Hearing Against the Schools and ASPIRA

188. In addition to ASPIRA's wrongful exclusion from the hearing, the hearing was not conducted in a fair and objective manner.

189. The hearing officer allowed the District to introduce skewed and irrelevant data against the Schools.

190. The hearing officer refused to accept or consider evidence of past precedent.

191.   On multiple occasions, the hearing officer refused to allow Stetson and Olney to introduce evidence demonstrating that other schools with similar circumstances had their charters renewed.

192.   The hearing officer repeatedly denied inquiry into other relevant evidence favorable to ASPIRA, Stetson, and Olney. For example, he denied inquiry into the CSO's reports, conclusions, and underlying methodology, even though the CSO's recommendations colored the entirety of the charter renewal proceedings.

193.   The hearing officer refused to allow Stetson and Olney to introduce evidence of ASPIRA's then-pending (but now completed) private funding transaction that would have mooted the ill-founded concerns regarding ASPIRA's prior financing from PNC Bank.

194.   The hearing concerned a record that necessarily is stale and incomplete due to the lengthy time delays (a) between the expiration of the charters and the hearing and (b) between the issuance of the CSO's report and the hearing.

195.   Indeed, the CSO did not even submit updated reports or give any indication that it would consider any information not covered by its previous reports even though there have been substantial changes in the circumstances of Stetson and Olney in the interim.

196.   The District consolidated the hearings for Stetson and Olney in ways that caused confusion and prejudice to them and ASPIRA. The conduct and structure of the hearing made it appear that the purported shortcomings of one school were being imputed to the other.

197.   The hearing days were rushed for no apparent reason other than to enable the Board to execute non-renewals in advance of the 2019–2020 school year (which the Board did not do anyway), and not out of any concern to provide a speedy and just process to ASPIRA, Stetson, or Olney.

198.   The hearing officer stated his intent to complete the hearing in order to meet this timeline while not interfering with his or the District's counsel's respective vacation schedules. And the hearing officer often cited a purported lack of time as the reason for precluding the Schools from fully developing the record at the hearing.

199.   Following the hearing, the District, Olney, and Stetson served post-hearing memoranda. Reinforcing that the hearing was about ASPIRA, the post-hearing memoranda from the District extensively concerned ASPIRA. For example, the District's 52-page memorandum regarding Stetson refers to ASPIRA by name 78 times, and the District's 57-page memorandum regarding Olney refers to ASPIRA by name 74 times.

200.   Ultimately, the hearing officer did not issue his report in time for the Board to execute a non-renewal in advance of the 2019–2020 school year, demonstrating even more that ASPIRA should have been allowed to intervene and any concern that ASPIRA's participation would have delayed or lengthened the proceedings was not genuine.

201.   ASPIRA continues to attempt to amicably resolve its disputes with the District. However, ASPIRA is concerned that the District, as it has in the past, will

seek unlawfully to extract concessions, such as enrollment caps, from ASPIRA and its schools under duress and penalty of non-renewal.

202.   In addition to the other violations of due process, ASPIRA also has reason to believe CSO staff, SRC members, Board members, and other District staff have engaged in inappropriate *ex parte* consultations with politicians and others during the non-renewal proceedings.

> **6.   After this Litigation Begins, the Hearing Officer Issues His Reports and the Board Votes to Deny Stetson's and Olney's Applications for Renewal While Refusing Yet Again to Allow ASPIRA to Intervene**

203.   On September 19, 2019, approximately one week after ASPIRA commenced this lawsuit in the Philadelphia Court of Common Pleas, the hearing officer issued his reports regarding the Stetson and Olney charters and recommended that both charters not be renewed.

204.   On October 8, 2019, the proceedings having now advanced from the hearing officer to the Board, ASPIRA again sought to intervene. ASPIRA sent a letter to the General Counsel for the Board, requesting that the Board reject the hearing officer's reports outright due to his wrongful exclusion of ASPIRA from the hearings. ASPIRA also requested that the Board permit ASPIRA to intervene in all further matters, conduct a *de novo* hearing regarding the renewal of the Stetson and Olney charters, and afford ASPIRA a full and fair opportunity to participate and present argument, evidence, and testimony, and examine all witnesses at the hearing.

205.   A copy of ASPIRA's October 8, 2019 letter seeking to intervene in the proceedings before the Board is attached as Exhibit J.

206.   On October 16, 2019, the hearing officer allowed Stetson and Olney to supplement the record and provide documentary evidence of the completion of the PNC Debt and resolution of any indebtedness by the schools. However, in his decision, the hearing officer inexplicably compared ASPIRA's transaction to a robber robbing a bank. The hearing officer's language and temperament were unbecoming of an independent factfinder or adjudicator and is further evidence of a bias against ASPIRA and its schools.

207.   During the Board meeting of October 17, 2019, the Board voted to deny Stetson's and Olney's applications for renewal. As of the date of this filing, ASPIRA understands that the Board has not issued a formal resolution regarding that vote.

208.   The Board ignored ASPIRA's October 8, 2019 letter and never responded to ASPIRA's request to, among other things, intervene in all proceedings before the Board.

> **7.    The District Unlawfully Demands Concessions from ASPIRA as Conditions for Renewing the Charters for Hostos and Pantoja**

209.   Parallel to the District's mistreatment of ASPIRA regarding Olney and Stetson, the District also has wrongfully refused to renew the charters for Hostos and Pantoja.

210.   A true and correct copy of the Charter for Eugenio Maria De Hostos Charter School ("Hostos Charter") is attached as Exhibit H.

211.   A true and correct copy of the Charter for Antonia Pantoja Charter School ("Pantoja Charter") is attached as Exhibit I.

45

212.    It is illegal for a school district in Pennsylvania to unilaterally impose caps on enrollment as a condition for renewing the charter of a charter school.

213.    In approximately October 2017, Hostos submitted to the CSO an application for renewal of Hostos' charter.

214.    In approximately October 2017, Pantoja submitted to the CSO an application for renewal of Pantoja's charter.

215.    On or about June 1, 2018, the CSO informed Hostos and Pantoja that the CSO would recommend renewal of their respective charters upon certain conditions, including that both schools agree to caps on their respective enrollments.

216.    The CSO demanded that Hostos and Pantoja sign documents supposedly voluntarily agreeing to the enrollment cap condition.

217.    Hostos and Pantoja have refused to agree to the enrollment cap condition demanded by the CSO.

218.    More than fifteen months later, the CSO has yet to submit its recommendation regarding the renewal of the charters for Hostos and Pantoja, and the District has not moved forward with the renewal of their charters.

219.    As of June 30, 2018, the charters for Hostos and Pantoja expired.

220.    ASPIRA has substantial property and liberty interests in the charters for Hostos and Pantoja and in its business as a charter management organization.

**D.    The District's Conduct Has Damaged ASPIRA**

221.    The District's wrongful conduct has damaged ASPIRA and, if left unchecked, will deprive ASPIRA of its ability to manage its charter schools and

deprive a significant number of students—many of whom are economically disadvantaged—the opportunity for a rich academic education in a safe and stable climate.

222.   In particular, the District's delays and failure to renew the charters of the ASPIRA-managed schools and the threat of a final non-renewal (and the ambiguity created by the recommendation of non-renewal) have caused increased difficulties in managing and funding its schools.

223.   For years, ASPIRA sought to obtain replacement financing that would eliminate the PNC Debt. In fact, prior to the 2016 non-renewal recommendations, ASPIRA had secured competitive market rate financing from a nationally recognized lender. The District's delays resulted in that financing opportunity being removed and making alternative financing more difficult and substantially more expensive.

224.   In June 2019, ASPIRA did obtain replacement financing that eliminated the PNC Debt.

225.   But for the District's wrongful conduct, including its delays in renewing each of the charters of the four ASPIRA-managed schools, ASPIRA would have been able to close on financing transactions years earlier and with more favorable terms than the transaction it ultimately closed in June 2019.

226.   Including actual costs and opportunities lost, such as forbearance costs, higher interest rates, and other transaction costs, ASPIRA has suffered damages of approximately $5,000,000 as a result of the District's conduct.

227. The District knew and/or it was reasonably foreseeable to the District that ASPIRA would suffer the aforementioned damages as a result of the District's conduct.

228. The District's wrongful and very public conduct also has stigmatized and damaged ASPIRA's good name and reputation.

229. The District has publicly stated and published false and misleading "findings" regarding ASPIRA and the Schools through at least (a) the Reports, (b) resolutions, (c) the non-renewal hearings, and (d) and the reports and other determinations issued by the hearing officer.

230. Although ASPIRA's schools have been able to remain in operation, the District's refusal to renew the charters and subject the schools to an interminably long process, has further stigmatized ASPIRA.

231. The District has disparaged and defamed ASPIRA and created a stigma that it is not qualified to operate charter schools in Philadelphia.

232. The District has acted deliberately and with full knowledge that its statements and "findings" regarding ASPIRA are false and misleading.

## COUNT I: BREACH OF CONTRACT

233. ASPIRA restates and incorporates all prior allegations set forth in this Amended Complaint.

234. An actual justiciable controversy exists between the parties regarding their rights and liabilities.

235.   The selection of ASPIRA as a Turnaround Team as a result of ASPIRA's response to RFP-260 formed a binding enforceable contract between ASPIRA and the District.

236.   The selection of ASPIRA as a Turnaround Team for Stetson formed a binding enforceable contract between ASPIRA and the District.

237.   The selection of ASPIRA as a Turnaround Team as a result of ASPIRA's response to RFP-286 formed a binding enforceable contract between ASPIRA and the District.

238.   The selection of ASPIRA as a Turnaround Team for Olney formed a binding enforceable contract between ASPIRA and the District.

239.   Material terms of ASPIRA's and the District's agreements include but are not limited to, ASPIRA's rights and status as a Turnaround Team, its rights and status as the Turnaround Team for each of Olney and Stetson, its right to receive notice of any actions adverse to the Olney and Stetson's charters and/or ASPIRA's rights and status as a Turnaround Team, its right to be terminated only for cause, and its right to due process before termination.

240.   The non-renewal of the Olney Charter and/or Stetson Charter necessarily will deny ASPIRA its rights and status as a Turnaround Team for each school, and non-renewal of both charters will deny ASPIRA of its rights and status as Turnaround Team altogether.

241.   The District owes a covenant of good faith and fair dealing to ASPIRA, including in the exercise of any discretion the District has under its agreements with ASPIRA.

242.   The parties' course of conduct and course of performance further establishes that the District and ASPIRA have a binding enforceable agreement.

243.   ASPIRA is a party to the Stetson and Olney Charters and/or an intended third-party beneficiary of the charters with enforceable rights thereunder, at least insofar as ASPIRA's right to receive notice, its right to be terminated only for cause and after due process, and the District's representation that it is bound by all terms and conditions of all exhibits attached to the charters. The circumstances are so compelling that recognition of ASPIRA's rights is appropriate to effectuate the intention of the parties to the charters.

244.   The District has breached and continues to breach its contractual obligations to ASPIRA, including the duty of good faith and fair dealing, by, among other things, wrongfully denying or threatening to wrongfully deny ASPIRA its status as a Turnaround Team, wrongfully denying or threatening to wrongfully deny ASPIRA its status as a Turnaround Team for Stetson and Olney,  failing to provide all required notices to ASPIRA and/or ASPIRA's Chief Executive Officer, Alfredo Calderon, threatening to deny and/or denying the renewal of the charters for Stetson and Olney, and refusing to allow ASPIRA to participate in all proceedings related to the renewal of the charters.

245.   ASPIRA has been damaged by the District's conduct by, among other things, the loss of contractual rights, injury to ASPIRA's reputation, loss of good will, and increased financial and administrative costs and burdens as alleged in this Amended Complaint.

WHEREFORE, ASPIRA demands judgment against the District, and respectfully requests that the Court:

a.   Declare that the District is in breach of its contractual obligations to ASPIRA;

b.   Declare that ASPIRA has the right to receive formal notice of and participate in any and all hearings and actions concerning the renewal or non-renewal of the Olney and Stetson Charters;

c.   Declare that ASPIRA has the right to have its status as a Turnaround Team and as a Turnaround Teams for Olney and Stetson terminated only for cause and after due process;

d.   Declare that any adjudication by the District issued prior to, or issued based upon findings, hearings, or processes occurring prior to ASPIRA's intervention is a breach of contract, null, void, and not enforceable;

e.   Preliminarily and permanently enjoin the District from terminating ASPIRA's status and rights as a Turnaround Team, and specifically as a Turnaround Team for Stetson and Olney,

without cause and without providing due process prior to such termination;

f.    Preliminarily and permanently enjoin the District from refusing to renew the charters of Stetson and Olney based on any findings, hearings, or processes occurring prior to ASPIRA's intervention;

g.    Award all damages, including but not limited to compensatory and nominal damages, in the maximum amount allowable by law; and

h.    Afford such other relief as the Court deems just and proper.

### COUNT II: VIOLATION OF DUE PROCESS

246.    ASPIRA restates and incorporates all prior allegations set forth in this Amended Complaint.

247.    At all times relevant to this Amended Complaint, the District was acting under color of state law and continues to act under color of state law.

248.    ASPIRA's status and rights as a Turnaround Team, its status and rights as Turnaround Team for Stetson and Olney, its status and rights as a charter management organization, its rights with respect to the charters for Stetson, Olney, Hostos, and Pantoja, and its retention of such statuses and rights, are substantial property rights and liberty interests and ASPIRA is entitled to due process protections under the United States and Pennsylvania Constitutions.

249. The District's actions shock the conscience, and are fraudulent, dishonest, unlawful, malicious, conducted in bad faith, and intended to injure in a manner unjustified by any government interest.

250. The District is denying and/or threatening to deny ASPIRA's status and rights as a Turnaround Team, as well as a Turnaround Team for Stetson and/or Olney, without due process of law.

251. The District is denying and/or threatening to deny ASPIRA's right to practice its chosen profession as a charter management organization and its rights within the charters at issue by eliminating the charters for each and every ASPIRA school in Philadelphia for improper and unlawful reasons and without due process of law.

252. ASPIRA has sought and intends to seek approval from the District for additional applications for charters and renewals of charters.

253. The District's conduct violated and violates ASPIRA's clearly established rights by, among other things:

    a.    denying ASPIRA the right to participate in the non-renewal proceedings;

    b.    denying ASPIRA the right to formal notice of the proceedings;

    c.    denying ASPIRA any meaningful opportunity to address the Board directly;

    d.    allowing *ex parte* contacts with those functioning in adjudicatory capacities for the District;

e.  commingling and refusing to sufficiently separate the prosecutorial and adjudicatory functions of the District in non-renewal proceedings;

f.  appointing a hearing officer with conflicts of interest;

g.  threatening to demand unlawful concessions from ASPIRA and its schools, such as enrollment caps, under duress and penalty of charter non-renewal;

h.  failing to provide a speedy process and delaying determinations regarding the charters of each of ASPIRA's schools for unlawful and bad faith purposes, such as to avoid review, deny aggrieved parties the right to appeal to and obtain review by the CAB, damage ASPIRA and its schools, force the surrender of charters, and obtain concessions as conditions for the renewal of charters;

i.  unfairly speeding up the process under false pretenses to manufacture rationales to take action adverse to ASPIRA (*e.g.*, the denial of ASPIRA's petition to intervene based on the supposed delay that would have resulted by allowing intervention);

j.  using and offering irrelevant, manufactured, and misleading evidence against Olney, Stetson, and ASPIRA, and refusing to accept relevant evidence offered in response by Olney and Stetson

(and, in the case of ASPIRA, not allowing ASPIRA to offer any evidence at all);

k.   using and offering evidence against ASPIRA, Olney, and Stetson regarding conduct that has long been known to and/or ratified or acquiesced to by the District.

254.   ASPIRA has been wrongfully deprived and is at risk of wrongful deprivation of its protectable interests through the procedures used against it, the current procedures and safeguards are inadequate to protect ASPIRA's interests and those of other charter management organizations and charter schools, and further procedures and safeguards are necessary to protect ASPIRA's interests and those of other charter management organizations and charter schools.

255.   The District has no interest in the wrongful denial of ASPIRA's rights and the rights of other charter management organizations and charter schools. There will be no significant burdens to the District to provide additional and substitute procedures and safeguards.

256.   The violations of due process inherent in the charter renewal/non-renewal process are clear.

257.   A permanent injunction is necessary to prevent continuing violations of ASPIRA's due process rights, for which there is no adequate redress at law.

258.   Greater injury will result from refusing rather than granting this relief and a permanent injunction will prevent the further violation of due process.

WHEREFORE, ASPIRA demands judgment against the District, and respectfully requests that the Court:

a.  Declare that the District violated and is violating ASPIRA's substantive and procedural due process rights;

b.  Declare that ASPIRA has the right to intervene in the non-renewal proceedings;

c.  Declare that it is a violation of law for the District to delay a final determination of a charter school's application for renewal for the purposes of avoiding review, denying aggrieved parties the right to appeal to and obtain review by the CAB, damaging charters and management organizations, forcing the surrender of charters, and/or obtaining concessions as conditions for the grant of a charter or renewal;

d.  Declare that any adjudication by the District issued prior to, or issued based upon findings, hearings, or processes occurring prior to ASPIRA's intervention is not "valid" under 2 Pa.C.S.A. § 553;

e.  Preliminarily and permanently enjoin the District from refusing to renew the charters of Stetson and Olney based on any findings, hearings, or processes occurring prior to ASPIRA's intervention;

f.  Order the District to allow ASPIRA to intervene in the non-renewal proceedings regarding the Stetson and Olney charters;

g.   Order the District to finally determine the applications for renewal of the charters of Stetson, Olney, Hostos, and Pantoja, without undue delay, but only after affording due process to ASPIRA;

h.   Order the District to implement adequate procedures and safeguards to protect the property and liberty interests of charter schools and their management organizations, including but not limited to:

   i.   providing charter management organizations and Renaissance School Turnaround Teams with the opportunity to meaningfully participate in non-renewal proceedings adverse to a charter management organization's charter schools or a Renaissance School Turnaround Team's charter schools;

   ii.   providing notice to charter management organizations and Renaissance School Turnaround Teams regarding non-renewal proceedings adverse to a charter management organization's charter schools or a Renaissance School Turnaround Team's charter schools;

   iii.   providing charter management organizations, Renaissance School Turnaround Teams, and charter schools with the opportunity to meaningfully address the Board regarding

57

non-renewal proceedings adverse to a charter management organization's charter schools or a Renaissance School Turnaround Team's charter schools;

iv.     prohibiting *ex parte* contacts with or by any individuals or bodies functioning in an adjudicatory capacity for the District;

v.     separating those who function in a prosecutorial capacity and those who function in an adjudicatory capacity for the District in non-renewal proceedings;

vi.     only appointing hearing officers without conflicts of interests;

vii.     prohibiting the District from demanding conditions for renewal that the District may not otherwise demand unilaterally by law, including but not limited to enrollment caps;

viii.     providing a just and speedy process with reasonable timelines for charter management organizations, Renaissance School Turnaround Teams, and charter schools to obtain a fair and objective determination of charters and the renewals of charters, including but not limited to review by the Charter Appeals Board;

    ix.      prohibiting the District from basing any determinations of non-renewal on irrelevant, manufactured, or misleading evidence; and

    x.      allowing charter management organizations, and Renaissance School Turnaround Teams, and charter schools to offer any and all relevant evidence in support of renewal.

i.    Award all damages, including but not limited to compensatory and nominal damages, in the maximum amount allowable by law;

j.  Award of attorneys' fees and costs in the maximum amount allowable by law; and

k.  Afford such other relief as the Court deems just and proper.

CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY

Dated: October 21, 2019

By: _____

Kenneth I. Trujillo, I.D. 46520
Wendy Lappin Barragree, I.D. 80465
300 Conshohocken State Road, Ste. 570
Conshohocken, PA  19428
Telephone: (610) 772-2300
Facsimile: (610) 772-2305
E-mail: ktrujillo@chamberlainlaw.com
E-mail: wbarragree@chamberlainlaw.com

STAPLETON LAW LLC

By:  /s/ John S. Stapleton
John S. Stapleton, I.D. 200872
3000 Atrium Way, Suite 200
Mount Laurel, NJ 08054
Telephone: (856) 259-3300
Facsimile: (856) 457-6124
E-mail: jss@stapletonlawllc.com