IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ASPIRA, INC. OF PENNSYLVANIA | : | CIVIL ACTION |
| | : | |
| v. | : | No. 19-4415 |
| | : | |
| THE SCHOOL DISTRICT OF | : | |
| PHILADELPHIA | : | |

**MEMORANDUM**

**Juan R. Sánchez, C.J.**                                                                 **August 10, 2021**

Plaintiff Aspira Inc. of Pennsylvania contends a contract was formed when it was selected to operate two charter schools for Defendant The School District of Philadelphia. Aspira then contends the School District breached that contract by seeking nonrenewal of the charter schools, willfully delaying a final decision on renewal of the charter schools, and excluding Aspira from the nonrenewal hearings for the charter schools. For damages, Aspira seeks out-of-pocket costs for its higher priced financing with higher interest rates and smaller financial commitments from lenders as a result of the School District's delays in nonrenewal. The School District, on the other hand, contends it has no contractual relationship with Aspira at all. After exchanging hundreds of pages of documents with Aspira, vetting and selecting Aspira as a qualified organization to operate two low-performing schools, and continuously communicating with Aspira and its management team throughout the performance of the charters, the School District argues it owes Aspira nothing. As untenable as this position may appear, it is nonetheless true. After a six-day video bench trial, the evidence in this case shows there is a long-standing relationship between Aspira and the School District. That relationship, however, is not based on a contract between the two entities. Because Aspira has not proven a contract existed, the Court finds for the School District and will enter judgment in its favor.

## FINDINGS OF FACT[1]

Aspira is a nonprofit organization that promotes leadership and education in low-income and Latin communities. Aspira operates numerous programs including youth programs, mentoring, after-school and summer programs, and charter schools. Aspira is a charter management organization for five charter schools in the School District of Philadelphia. Two of these charter schools are the subject of this litigation: John B. Stetson Charter School and Olney Charter High School. The School District selected Aspira to serve as a "Turnaround Team" for the schools which essentially permitted Aspira to operate and manage them.

The School District provides public education for school-aged children in Philadelphia. It is governed by the Philadelphia Board of Education.[2] It operates over 200 schools and oversees the management of approximately 86 charter schools. Charter schools are monitored and evaluated by the School District's Charter School Office (CSO). The CSO creates standards for charter schools and monitors the performance of those schools.

---

[1] These findings of fact are based on the evidence presented during the trial of this case, held on April 29–30, 2021, and May 3–6, 2021. At trial, the Court heard testimony from Aspira's three witnesses: Thomas Darden, Aspira's Chief Financial Officer and former executive officer of the School District; Alfredo Calderon, Aspira's Chief Executive Officer, and Kathryn McKinley, Aspira's Senior Director of Special Education. The Court also heard testimony from the School District's four witnesses: Peng Chao, the Executive Director of the Charter Schools Office (CSO), Lauren Iannuccilli, former CSO's employee from June 2013 to May 2018, DawnLynne Kacer, former Executive Director of the CSO, and Claire Landau, Chief of Staff of the Board of Education (and formerly the School Reform Commission). All findings are made by a preponderance of the evidence.

[2] The School District was declared a distressed school district from December 21, 2001, until June 30, 2018. During this time, the School District was governed by the School Reform Commission (SRC). The SRC voted to dissolve as of June 30, 2018, and returned governance to the Philadelphia Board of Education.

### A.  The Renaissance School Initiative

In early 2010, the School District implemented the Renaissance School Initiative. *See* Ex. 15. The Initiative was intended to help the School District improve chronically underperforming schools (known as "Renaissance Schools") through restructuring and external partnerships. The Initiative required the School District to identify and vet external partners with experience in charter school management known as "Turnaround Teams." The Turnaround Teams were then paired with and responsible for "turning around" the identified Renaissance Schools in the district.

The Renaissance School Initiative Policy, adopted by the School District in SRC-36, describes the procedure of implementing the Renaissance School Initiative and defines relevant terms.[3] *See* Ex. 15. The Policy contemplates three models of Renaissance Schools—Innovation, Contract, and Charter Schools—each with its own characteristics. In this case, the relevant model is the charter school model.[4]

---

[3] There are many documents referring to the Renaissance School Initiative including a 2009 strategic plan and recommendations from a charter school advisory board. These other documents, however, were not adopted by the then-governing body of the School District—the SRC. The Renaissance School Initiative Policy, *see* Ex. 15, does explicitly refer to the "Imagine 2014" five-year strategic plan, *see* Ex. 10. The Court thus finds the School District, through the SRC, did at least acknowledge the strategic plan and to some extent relied on the representations in that plan to reach the Renaissance Schools Initiative Policy in SRC-36. The recommendations from the charter school advisory board, on the other hand, were not expressly adopted by the SRC or referred to in any official SRC policies or resolutions. *See* Tr. 1:208:13–9:8. To the extent Aspira relies on the advisory board recommendation report, *see* Ex. 11, it is afforded little credible weight, if any.

[4] The Innovation and Contract School models are not wholly irrelevant to this case. For example, the School District's explanation and definition of these other two models gives context for the Charter School model. And when the School District refers to Renaissance Schools or Turnaround Teams generally, the specific definitions of each model are important to consider when interpreting those general statements.

The Policy defines a Charter School as:

> [A]n independent Local Education Agency with a charter school board of trustees to oversee all elements of school curriculum and operations. The relationship between charter schools and the School District shall be [in] accordance with the Pennsylvania Charter School Law and with the *charter agreement between the School District and the charter school's board of directors*. In order to adhere to the mission of the Renaissance Schools initiative and to maintain high levels of accountability, Renaissance charter agreements will include provisions outlining requirements for student enrollment, student achievement, data reporting, grade configuration, facilities, and inclusion of the Renaissance Schools charter school in the School Annual Report and other School District accountability systems. The provisions will include stringent academic requirements for turnaround school success that may exceed performance targets for non-Renaissance Schools charter schools. These provisions will also be used as a basis for a decision to renew, not renew or revoke a Renaissance School[']s charter at the end of its term.

Ex. 15, at 3 (emphasis added). The policy also states, "[a] Charter School shall be governed by an *independent board of trustees* pursuant to the Charter School Law." *Id.* at 6 (emphasis added). A Turnaround Team is defined as "[a]n individual or organization selected to turnaround and manage a Renaissance School." *Id.* at 3.

Around the same time as the Policy, the School District also released the 2010-2011 Renaissance Schools Implementation Plan. *See* Ex. 13. The Plan detailed the procedure and timeline for the first set of Renaissance Schools. The Plan's definition of a charter school is similar to the definition provided in the Policy. *See id.* at 12. The Plan also states, "[e]ach Renaissance School Turnaround Team will enter into a Performance Agreement, Contract or Charter with the School District . . . for a period of up to five (5) years." *Id.* at 13. And "[i]n the case of a Charter School[,] the School District will exercise the right to revoke the Charter if the *terms of the Charter Agreement* are not satisfactorily upheld." *Id.* at 14 (emphasis added).

To identify and recruit Turnaround Teams for the Initiative, the School District employed a multi-step request for proposals process. *See id.* at 4, 17. The School District sought out "highly qualified" organizations to "manage" the identified Renaissance Schools. *See id.* at 5. First, the

4

School District released a Request For Qualifications (RFQ) and solicited responses to evaluate potential Turnaround Teams and their ability to manage Renaissance Schools. Second, the School District sent out a Request For Proposals (RFP) which required then-qualified applicants to submit detailed plans for turning around specific schools. Then, after reviewing the RFP responses, the School District selected finalist Turnaround Teams and matched them with Renaissance Schools. Once Renaissance Schools and Turnaround Teams were matched, the School District issued the respective contracts or charters.

The Plan also details the Turnaround Team selection process and how it will be conducted with each Renaissance School model. For the charter school model, Turnaround Teams were required to "complete a separate charter school application in order to meet requirements of Pennsylvania Charter School Law and the SRC's Charter School Policy." *Id.* at 19. The Plan also noted the "contract form" for the charter school model would be the charter agreement. *See id.* at 26, App. A.

For the contract model, however, the Initiative Policy and Implementation Plan states the "School District will enter into a contract with the organization that specifies the responsibilities of both parties and establishes accountability for Contract School performance." Ex. 15, at 2–3; *see* Ex. 13, at 11. The description of the charter school model omits similar language.

Although the School District's documentation of the Renaissance Initiative provides a picture of the intent and purpose of the Initiative, both parties presented testimony of former or current School District employees who described the Initiative. Aspira presented the testimony of Thomas Darden, the current Chief Financial Officer of Aspira, but who was employed at the School District and served on the Renaissance Schools Advisory Board during the first year of the

5

Renaissance Initiative. The School District presented testimony from Peng Chao, the current Executive Director of the CSO.

According to Darden, the School District intended to hold Turnaround Teams accountable for meeting certain measures and improving the schools. He testified this was expected to be done through binding contracts between the School District and the Turnaround Teams. He often referenced the Renaissance Schools Advisory Board's recommendation report, Ex. 11, which stated numerous times that the School District would enter into contracts with the Turnaround Teams selected. *See* Ex. 11, at 6; Tr. 1:47:21–48:13. But Darden also recognized that the report was only a recommendation and was not adopted by the SRC as final or official School District policy. *See* Tr. 1:208:4–209:8.

Darden's testimony conflicts with the plain language of most of the School District's documentation regarding the Renaissance Initiative. For instance, Darden asserted contracts would be entered with Turnaround Teams selected to run the schools. *See* Tr. 1:51:4–6. Darden did not distinguish between the three models of Renaissance Schools and stated generally, that Turnaround Teams were under contract with the School District. But in the School District's Initiative Policy and Implementation Plan, the proposed school models only provided for contracts with Turnaround Teams under the contract model. *See* Ex. 15, at 4 (describing a contract school being "under contract with the School District" but stating charter schools would be governed by an independent board of trustees).

The Court also recognizes that Darden is biased because he left the School District's employ under unfavorable circumstances and is currently the CFO of Aspira. While he was employed by the School District Darden faced criticism from some of the SRC commissioners as part of a disagreement regarding School District policy on enrollment expansion for charter

schools. Darden resigned shortly thereafter. *See* Tr. 1:182:22–184:24. After resigning, Darden immediately joined Aspira as an assistant to the CEO until he moved up to his role as CFO. Prior to working for the School District, Darden had little to no experience in education and was unfamiliar with the Pennsylvania Charter School Law or the operations of charter schools in the School District. *See id.* 1:178:21–180:8. Because Darden's testimony is inconsistent with the terms of the School District's documentation, fails to fully explain those inconsistencies, and is biased against the School District and in favor of Aspira, the Court does not find his testimony fully credible.

Chao, on the other hand, testified that the School District did not enter contracts with Turnaround Teams who were paired with Renaissance Schools under the charter model.[5] Chao has worked in the CSO with both Renaissance and non-Renaissance charter schools since 2013. He is familiar with the charter schools process and structure and testified that the School District has not amended its policies regarding charter schools or the Renaissance Initiative since the implementation of the Renaissance Initiative in 2010. In fact, the Renaissance Initiative remains an active policy of the School District to date. *See* Tr. 4:107:23–108:15 ("Q: Does this policy remain on the books, so to speak, of the District, the policy books? A: That's my understanding."). Although Chao has a strong familiarity with the charter school model and the Renaissance Initiative, he was not employed by the School District when the Initiative was first created. His

---

[5] There are three models of Renaissance Schools. Contract schools were created by the School District when it contracted with an external partner to operate a school. *See* Ex. 13, at 11 (describing contract schools and stating "[t]he School District will establish a contract *with the organization* that specifies the responsibilities of both parties, and establishes accountability for Contract School performance" (emphasis added)). Chao, who has only worked in the CSO, was focused on the charter school model in the Renaissance Initiative. *See* Tr. 4:102:6–9. Because Stetson and Olney were both awarded under the charter model, the Court focuses on Chao's understanding of the charter model.

testimony as it relates to the intent and purpose of the Renaissance Initiative, a policy that was implemented before he was employed by the School District, is thus not fully credible either.

Although the Court does not give full weight to either witness on this issue, the Court finds the School District intended for Turnaround Teams to be held accountable for meeting certain objectives and performance measures. Because there were three different school models, the Court finds that accountability would be established through the contract or agreement provided for each model. This would later be determined by Turnaround Teams' responses to the RFQs and RFPs and what document emerged from those exchanges. The Court also finds the prospective Turnaround Teams were provided with full explanations of the different school models and could make informed decisions about which model to pursue. Finally, the Court finds the Renaissance Initiative operated as a method for the School District to match qualified teams with distressed schools to start a significant change—not necessarily to enter into contracts with the external organizations without tending to the needs of the individual schools or the relevant school model pursued.

### B.  Aspira's Selection as a Turnaround Team

In the first and second year of the Renaissance Initiative, Aspira submitted a response to the School District's RFQs to qualify as a Turnaround Team under the charter school model. *See, e.g.*, Ex. 16. Aspira pursued the charter school model because it had experience in running two other charter schools in the district. Aspira stated the new Renaissance charter schools "call for a charter agreement, independent non-profit board, alignment to Pennsylvania State Academic Standards, employ non-School District of Philadelphia employees . . . , have compensation determined by the charter school board, have a calendar that meets the PA Public School Code, have a School Advisory Council (Parent Council), and are funded by the Charter School Law." *Id.*

8

at 11. Aspira recognized these features of the charter school model and stated they were "identical" to those of the other charter schools it manages. *See id.* As a result of Aspira's RFQ response, Aspira was certified as a Turnaround Team.

The School District released RFP-260 in early-2010 and RFP-286 in late-2010, which sought submissions from the certified Turnaround Teams, including Aspira.[6] *See* Tr. Ex. 1-A, at 5; Tr. Ex. 2-A, at 6. The RFPs state the selected Turnaround Teams, or respondent,[7] would "be responsible for all aspects of restructuring and managing the school awarded." *Id.* Any selected Turnaround Teams were expected to meet specific performance goals as stated in an accountability agreement which was a condition of any agreement entered later. Also, the RFPs and any proposals from respondents were to be "incorporated into and made a part of the contract, charter or performance agreement." *Id.* at 6. Turnaround Teams who submitted proposals in response to the RFPs were bound by the terms therein. *See, e.g.*, *id.* ("By voluntarily submitting a proposal in response to this RFP, the responder acknowledges all of the terms, provisions and requirements of this RFP and agrees to abide by those terms, provisions and requirements . . . ."); *id.* at 9. "Any proposer [who] desir[ed] to operate a Renaissance School as a charter school [was required to] also complete [an] included Renaissance Schools Charter Application." *Id.*

---

[6] The RFPs were issued approximately eight months apart but are generally identical in all relevant ways. *Compare* Tr. Ex. 1-A, *with* Tr. Ex. 2-A. RFP-260 sought to pair Turnaround Teams with Renaissance Schools for the 2010-2011 school year and RFP-286 sought to do the same for the 2011-2012 school year.

[7] The RFPs consistently identify the certified Turnaround Teams as the "respondent," "proposer," or "finalist" to the RFP and use the three terms interchangeably. *See id.* The Court will use the words as they appear in a specific provision in the RFPs, but notes any mention of a Turnaround Team, respondent, proposer, or finalist, is referring to the same party. And when Aspira is a party to a document, the three terms refer to Aspira.

The RFPs sought detailed plans for operating specific schools. The RFPs, on their own, did not create an obligation to issue a charter or match a Renaissance School with a Turnaround Team. Rather, the RFPs sought to bind the responding Turnaround Teams with the terms in the RFPs including the RFP process, the selection process, and ultimately, any operation of a school (if selected). In the event an agreement was entered into for a school, i.e., a charter agreement, the RFPs state "the School Reform Commission reserves the right to revoke or not renew a charter for what it deems to be material violations of the charter agreement and any other reasons permitted under applicable law." Tr. Ex. 1-A, at 6; Tr. Ex. 2-A, at 7. If a charter agreement was not entered, the RFPs had no binding effect on either the School District or the respective Turnaround Team. *See* Tr. 2:24:15–19; 2:25:7–14.

Aspira submitted a response to RFP-260 in which it sought to be paired with three schools, including Stetson Middle School, *see* Tr. Ex. 1-B, at 5, and a response to RFP-286 in which it sought to be paired with Olney East and Olney West High Schools. Aspira's responses were accepted by the School District and Aspira submitted respective charter school applications.[8] The School District then issued SRC-45 and SRC-48, granting charters for John B. Stetson Charter School and Olney Charter High School.[9] *See* Exs. 1, 2.

### C. The Charter School Model and the Stetson and Olney Charters

Charter schools are a unique model of school with unique laws and requirements for their operation. Charter schools are public schools governed by an independent board of trustees or

---

[8] Aspira submitted the charter applications and provided details on the operations of each charter school. The applications described curriculum, staffing, financials, governance, and programs. The applications also acknowledged that an independent board of trustees would be established and would be responsible for governing each charter school. *See* Exs. 12, 20.

[9] The charter granted for Olney Charter High School contemplated the merger of the former Olney East and Olney West High Schools. *See* Exs. 2, 21, 22.

directors. The charter schools are organized as public nonprofit corporations under Pennsylvania law. Charter schools, including those in the School District of Philadelphia, are governed by the Pennsylvania Charter School Law (CSL) unless the School District's governing body explicitly suspends or grants an exemption from the CSL.

As part of the Renaissance Initiative, the School District offered a charter school model for the Renaissance Schools' turnaround. The charter school model contemplated that any relationship between charter schools and the School District would be "in accordance with the Pennsylvania Charter School Law." Ex. 15, at 2; Ex. 13, at 12 (stating Renaissance charters are "primarily defined by Pennsylvania Charter School Law"); *id.* ("Per Pennsylvania Charter School Law . . . ."). There is no evidence that the SRC suspended the CSL for the Renaissance Initiative. Nor is there evidence the SRC exempted Renaissance charter schools from the CSL. The Court thus finds the CSL applies to Renaissance charter schools.[10]

---

[10] Aspira argues language in the RFPs suspended the CSL or exempt Renaissance charter schools from the CSL. This is simply not supported by the evidence. The Court recognizes there is no language in any document explicitly stating Renaissance charter schools are not exempt from the CSL, but there is also no language stating the Renaissance charter schools *are* exempt from the CSL. Although the School District, through the SRC, had the authority to suspend or exempt schools from the CSL, there is simply no evidence that occurred here.

On this fact, Aspira points to the RFPs which state, "decisions made regarding any charter application submitted in response to this RFP shall be made in accordance with the provisions and requirements of this RFP, notwithstanding any contrary provisions in the Charter School Law." Exs. 1-A, at 5, 2-A, at 5. This language, however, does not express a suspension of or exemption from the CSL. Also, the language is limited in its application. First, it is limited to "decisions made regarding a *charter school application*" and does not include the issuance of a charter or the operation of a charter school. Here, Aspira does not take issue with the charter application or the decisions made regarding its applications for Stetson and Olney. Second, it is limited to terms of the RFP that are *contrary* to provisions in the CSL. Aspira has not pointed to any language in the RFPs and the CSL that is in fact contrary to each other. In the absence of evidence showing the School District or SRC suspended or exempt the Renaissance charter schools from the CSL, the Court finds the CSL applies with equal force to Renaissance charter schools.

Turnaround Teams applying for a charter school model acknowledged the requirements for charter school operations including a charter school application, the formation and incorporation of a new and independent charter entity as a Pennsylvania nonprofit corporation, and a charter agreement. Although the RFPs state, "Turnaround Teams for a Charter School will sign a charter agreement with the School District," Ex. 2-A, at 9, the RFPs also state the other known requirements for charter schools including the formation of the nonprofit corporation. Aspira is familiar with the charter school model and operates two other charter schools.

Some of the language in the RFPs and other documents regarding the anticipated relationship with the Turnaround Teams under the charter school model is imprecise. For instance, the School District states numerous times that the Turnaround Team would be selected to enter into a contract or charter agreement with the School District. *See, e.g.*, Ex. 2-A, at 7, 9 ("Turnaround Teams who are ultimately selected following the RFP . . . will enter into a form of agreement with the School District."). Oftentimes, the language is referring generally to Turnaround Teams without specifically distinguishing between the three school models. In some cases, however, the language speaks directly to charter schools. *See id.* at 9 ("*Turnaround Teams for a Charter School will sign* a charter agreement . . . ." (emphasis added)).

Regardless of this imprecise language in some documents, the charters in this case explicitly state they are agreements between the School District and the respective charter school— Stetson or Olney. *See, e.g.*, Ex. 1, at 1 ("This Charter . . . is made and entered into . . . by and between The School District of Philadelphia . . . and the John B. Stetson Charter School; an Aspira, Inc. of Pennsylvania School . . . ."). The charters acknowledge and address the separate Pennsylvania nonprofit corporation that was created to operate the charter schools—John B. Stetson Charter School and Olney Charter High School. The charters also note that the charter

schools act through and by their board of trustees. The charters were signed by a School District representative and the two members of the respective board of trustees. *See* Tr. Exs. 1, at 31; 2, at 31.

The charters announce Aspira as the Turnaround Team for each charter school. *See* Exs. 1, at 2; 2, at 2. The charters also note that each charter school is named "[a]n Aspira Inc. of Pennsylvania School." *See* Exs.1, at 1, 2, at 2. But they make no other mention of Aspira, as a party or otherwise. And Aspira did not sign the charters. *See* Exs. 1, 2.

Aspira's CEO, Calderon, testified he believed Aspira contracted with the School District to "manage and operate" the charter schools through the issuance of the charter. Tr. 2:174:7–16; 2:185:11–18. He testified the RFP process and Turnaround Team selection process provided the basis for his belief.

The Court does not find his testimony credible on this issue.[11] Calderon is familiar with charter schools generally and the CSL. *See, e.g.*, Tr. 2:193:14–21 ("[M]y understanding of the Charter School Law . . . ."). And he took all the same steps for Stetson and Olney's charters as he did for the other charters Aspira manages in the district. *See, e.g.*, Tr. 2:176:5–8 ("We recruited the board for the new charter school, John B. Stetson Charter School."). His signature is found on Aspira documents, the charter applications and the responses to the RFQ, which state Aspira is familiar with the charter school model and there were only minor differences between Renaissance and non-Renaissance charters.[12] He is also aware that the charter schools are distinct and separate

---

[11] The Court finds only that Calderon's testimony regarding his belief is not credible. The issue of whether a contract was actually formed is addressed as a conclusion of law.

[12] Notably, Aspira has acknowledged that the differences are limited to the Renaissance Schools remaining neighborhood schools (having a catchment area). *See* Ex. 16, at 11 (describing Aspira's interest in the charter school model and stating "[t]he only notable difference [between

entities from both Aspira and the School District. *See* Tr. 3:35:4–7. The Court thus finds Calderon understood or believed that Aspira did not enter the charters with the School District, only the respective charter schools and their boards did.

The Court finds there is a commonsense view of the evidence and specifically, the Stetson and Olney charters. The charter schools did not exist until the charters were signed. And Aspira is the party who made the grant of the charters possible. Aspira was prequalified as a Turnaround Team. It was sent RFP-260 and RFP-286. It submitted responses to the RFPs outlining its plans and designs for the charter schools. The RFPs and Aspira's responses were then incorporated into the charters to provide the accountability standards. *See* Ex. 1, at 5 (incorporating charter school application, which incorporated RFPs and responses); Ex. 1-A, at 6 (noting RFP and response would be incorporated into any forthcoming charter agreement). Aspira then submitted the charter application for each charter school. *See* Ex. 12, 20. The negotiations about the charter schools occurred between Aspira and the School District. And all obligations listed in the RFPs, responses, and applications were binding on the party to those documents—Aspira (because the charter schools did not yet exist). *See* Tr. 4:112:15–24. The board that ultimately held the charter was created by Aspira. The charters were thus issued because Aspira put together all the documents and met all the requirements for the charter schools. Even the School District's witness, Chao, made prior statements in which he stated *Aspira* was awarded or received the charter. *See* Tr. 4:189:23–195:5; Ex. 218.

---

Renaissance and non-Renaissance charter schools] is the identification of a specific catchment area").

### D.  Aspira's Management under the Stetson and Olney Charters

After the School District issued the charters, the charter schools entered into service agreements with Aspira. *See* Exs. 24, 27. Those agreements provide the terms in which Aspira delivers its management and operation services for each charter school.[13] They also describe the terms of Aspira's compensation for its services. Aspira is paid by each charter school pursuant to the service agreements. Aspira receives no compensation from the School District.

Both Aspira and the charter schools are identified as independent contractors in the service agreements. The agreements make no mention of the charters, the Renaissance Initiative, or the School District. The agreements are annual and Aspira has entered into an agreement with each charter school for each year it has managed the schools to date.

Each service agreement has a termination clause. The charter schools were permitted to terminate the service agreements for any reason with 30-days' notice, or in some of the agreements, for cause. *See, e.g.*, Ex. 24, at 7; Ex. 50, at 9. In the more recent service agreements, Aspira has also been given a right to terminate if it was not paid. *See, e.g.*, Ex. 50, at 9. These agreements were read and signed by Calderon on Aspira's behalf.

Since the Stetson charter in 2011, and the Olney charter in 2012, Aspira has managed the schools. Aspira has made dramatic improvements in both schools. Prior to the Renaissance Initiative, both Stetson and Olney presented some of the lowest scores in academics and had significant issues with student safety. *See* Tr. 2:157:9–160:5. Since Aspira began managing the schools, enrollment, attendance, and academics have improved. Compared to peer schools, Aspira

---

[13] Services were defined as administrative, financial, human resource, food service, transportation, maintenance, custodial, security, and general management services. *See, e.g.*, Ex. 24, at 2.

has demonstrated proficiency and growth in academics. Even the School District has acknowledged the schools' academic improvements since Aspira took over. *See, e.g.*, Exs. 66, 129.

Also, throughout the performance of the charters, the School District, CSO, and other School District employees regularly communicated with Aspira and Calderon about the schools' operations. *See, e.g.*, Tr. 1:84:1–23; Exs. 19, 56, 213. This communication is similar to that of other charter schools, including non-Renaissance schools. *See* Tr. 4:147:9–148:18. The School District communicates with "whomever the charter school requests." *Id.* at 147:13–15.

Sometime in 2011, Aspira obtained a loan from PNC Bank. The loan was obtained to refinance an Aspira facility, purchase a new facility and campus, and gain capital for renovations on the new campus (the Dougherty Campus). The original principal amount of the loan was approximately $18 million. *See* Tr. 1:109:19–22. The loan had a balloon payment due after five years while the interest payments were due throughout the term of the loan. *See id.* at 1:109:23–110:6. Because the building was leased, the lease payments were used to pay the interest due during the loan term. By late 2017, the loan balance was approximately $14.5 million.

The loan was guaranteed by both Stetson and Olney.[14] It was also guaranteed by three collateral properties: the new building, Aspira's headquarters, and the Pantoja facility. The three properties were appraised at $30 million.

Although Stetson and Olney did not operate from the Dougherty Campus,[15] each school used or and Olney leased space from the building sporadically from 2011 through 2017. The schools used the sports facilities or the auditorium. Although Olney did have a lease agreement to

---

[14] The loan was also guaranteed by Aspira's other charter schools. *See* Tr. 1:109:10–18.

[15] The Dougherty Campus was leased to Aspira's head start program on the first floor, Hostos Charter School on the second floor, and Aspira's Bilingual Cyber Charter School on the third floor.

occupy Dougherty Campus, there was no lease agreement or documentation regarding Stetson's use of the building.

In July 2014, the CSO sent a letter to Aspira requesting the PNC loan be restructured to remove the guarantees from Stetson and Olney. Prior to 2014, the School District was not aware of the charter schools' guarantees. In addition to the concerns regarding the PNC loan, the CSO raised other concerns related to Aspira's alleged treatment of the charter schools as subsidiaries, intercompany payables between the charter schools, and the similar make-up of the charter schools' boards of trustees. *See* Ex. 33. The CSO requested a detailed plan to address the issues.

Although Calderon acknowledged receiving the letter in July or August of 2014, Aspira did not respond to the letter until December 2014. At that time, Aspira stated the lender refused to renegotiate the loan to remove the guarantees under reasonable terms. *See* Ex. 36. There was no further action taken to restructure the loan or remove the guarantees. The CSO noted the loan and the charter schools' guarantees would be considered in any evaluations of Stetson and Olney and for their forthcoming renewals.

### E.  Nonrenewals of the Stetson and Olney Charters

The Stetson charter expired on June 30, 2015, and the Olney charter expired on June 30, 2016. In January 2015, the CSO recommended Stetson's charter be renewed for one year with conditions. *See* Ex. 38; Tr. 4:221:16–224:25. But no agreement was reached regarding the one-year renewal, and the charter was not renewed. Both charters were thus up for review in 2016. On April 11, 2016, the CSO recommended to the SRC that the Stetson and Olney charters not be renewed. The CSO's nonrenewal recommendation was premised on organization compliance deficiencies and concerns with financial stability. *See* Ex. 66, at 5; Ex. 67, at 5.

The most notable basis for the CSO's nonrenewal recommendation was Stetson and Olney's financial health and stability due to the PNC loan.[16] The CSO noted that Aspira owned the building (through a subsidiary) and owed approximately $13 million. *See* Ex. 66, at 20. The CSO also noted Stetson and Olney did not receive any benefits from the Dougherty Campus and it thus "rais[ed] further concerns of financial independence." *Id.*

The CSO detailed its nonrenewal recommendations and sent reports to the SRC. The CSO sent the reports to the chairs of each charter school's board, but they were not sent to Calderon or any other Aspira representative. Also, in April 2016, the CSO Executive Director, DawnLynne Kacer, presented the CSO's nonrenewal recommendations to the SRC. At that time, however, the SRC did not take action to adopt the CSO's nonrenewal recommendations.

Thereafter, Aspira attempted to work with the School District on gaining renewals for Stetson and Olney. Discussions between Aspira and the School District lasted several months. During these discussions, the School District, through the CSO, informed Aspira explicitly that the guarantees for the PNC loan needed to be removed. That condition, however, was not met.

In December 2017, the CSO issued updated reports in which it maintained its recommendation that the Stetson and Olney charters not be renewed. *See* Ex. 129. The updated reports were sent to the SRC and the charter schools and were publicly posted. And on December 14, 2017, the SRC held a public meeting. At that meeting, the SRC was scheduled to vote on the two resolutions that would institute nonrenewal proceedings against Olney and Stetson. Before the SRC voted, Kacer gave an oral presentation of the CSO's nonrenewal recommendation.

---

[16] The parties presented evidence focused on the PNC loan and the CSO's concern with it. The Court finds, however, the CSO raised several concerns regarding Stetson and Olney's fiscal management including internal control policies, the amount of net balances were receivables from Aspira, the amount of money owed to each school from other charter schools, lack of contracts for money owed or shifted between parties, and more. *See, e.g.*, Ex. 66, at 19–20.

Kacer's presentation was an overview of the nonrenewal recommendation and only provided a summary of the CSO's concerns with each charter school. Because of this, Kacer did not provide details regarding the PNC loan such as the value of the collateral securing it, or that Stetson and Olney used the Dougherty Campus from time to time. Kacer, at one point, stated Stetson and Olney received no direct benefit from the Dougherty Campus at all. *See* Ex. 133. But she later clarified, "Olney is slightly different, as [it is] actually a tenant at one of the buildings, a partial tenant. They have an alternative education program that [it] pay[s] a rental fee of $240,000 a year for. . . ." *Id.* And as for Stetson, Kacer testified she did not know that Stetson used the Dougherty Campus because there was no lease or other documents that would reflect its use. *See* Tr. 5:138:25–139:4; 5:35:5–22; 5:101:18–102:1. Although Kacer's comments of Stetson and Olney were critical, she also acknowledged Aspira's success with both schools and their communities when questioned by an SRC Commissioner.

Although Aspira asserts Kacer intentionally delivered false information and gave a misleading impression of the PNC loan and Aspira's costs for services, the Court finds Kacer was truthful and at worst, vague. Kacer testified she relied on the financial audits of each school in evaluating their financial viability. *See* Tr. 5:39:12–23. These financial audits document in great detail the status of each charter school's financial position. *See* Exs. 58, 59, 127, 128. Although these financial audits cannot prove the truth of the matter asserted within, they at least corroborate Kacer's statements in the nonrenewal reports and at the SRC meeting. There is no evidence establishing Kacer knew her statements were false or misleading.

Kacer's presentation did not give the details of the PNC loan such as the value of the building or the degree of risk created by the guarantees. Kacer testified, however, she had concerns about the loans regardless of the value of the collateral because based on her understanding of the

19

CSL, charter school funds should only be used to benefit the charter schools. *See* Tr. 5:59:23–60:17; 5:139:2–13; 5:75:18–76:2. She also testified she only provided a summary of the issues because the SRC had already received her long-form memos on the nonrenewal recommendations. The Court credits her testimony on this issue.[17]

After Kacer's presentation at the SRC meeting, the SRC voted on the nonrenewal recommendations for Stetson and Olney. In a 4-1 vote, the commission voted to adopt SRC-8 and SRC-9, which instituted nonrenewal proceedings for each charter school. Kacer then emailed the resolutions to the charter schools and Calderon. The nonrenewal proceedings were originally set to begin before April 2018, subject to rescheduling. The proceedings did not occur within that time frame.[18]

On December 15, 2018, the School District appointed a hearing officer for the Stetson and Olney nonrenewal hearings. *See* Ex. 160. The School District did not inform Aspira of the hearing

---

[17] The parties dispute whether Kacer's description of Aspira's services and costs for services was false or misleading. Kacer stated (in the reports and at the SRC meeting), that Aspira received reimbursement for administrative services or expenses including, but not limited to, maintenance, security, and information technology. *See, e.g.*, Ex. 129, at 9. Aspira contends this is an inaccurate portrayal of what it offers, which it believes should have been described as "direct service costs" in a "dollar for dollar" manner.

    This dispute is about semantics and terminology. Regardless of what term Kacer used, there is insufficient evidence to find it was false. Kacer's terminology was explained in her long-form memos in which she stated Aspira received "reimbursement" for certain services that she termed administrative. The Court finds this is consistent with Aspira's proffered "dollar for dollar" terminology. And Kacer's omission of "dollar for dollar" does not result in a finding that Kacer believed Aspira was marking up the expenses to the schools. In fact, after reviewing the entire presentation, there is no evidence this was implied at all. The Court thus finds Kacer's statements regarding Aspira's services and costs were not false.

[18] Starting in December 2017, governance of the School District was in transition. The SRC voted to disband itself and return governance of the School District to the Board of Education. This transition required appointments of new Board members and a robust orientation process. The new Board members were not even appointed until April 2018 and they had to assume their duties in July 2018. During this time, the School District was unable to proceed with nonrenewal proceedings for Stetson and Olney (or any other charter school).

officer's appointment. After learning of the hearing officer's appointment from the board chair of Stetson and Olney, Aspira petitioned to intervene in the nonrenewal proceedings. *See* Ex. 168. The hearing officer denied the petition. *See* Ex. 170. The hearing officer stated one of his reasons for denying the petition was because Aspira's interests were adequately represented by the charter schools. *See id.*

The nonrenewal hearings began on March 12, 2019, and lasted 16 days. Aspira was not a party to the nonrenewal hearings and was unable to present evidence or witnesses on its own behalf. After the conclusion of the hearings, several months passed without a decision.

On September 19, 2019, the hearing officer recommended nonrenewal of the Stetson and Olney charters. He issued a report on each charter school relying on his own factual findings and the actions of the charter schools to justify his recommendation. Although the renewals were "about" the charter schools, the reports extensively discuss Aspira and its management of the schools. The hearing officer issued supplemental reports on October 16, 2019.

On October 17, 2019, the Board of Education voted to adopt the hearing officer's recommendation and not renew the charters for Stetson and Olney. Both schools, however, remain open and operating under their respective charters to date.

## F.  Aftermath from the Nonrenewals

Since the initiation of the nonrenewal proceedings against Stetson and Olney, Aspira has applied for four new charter schools. For each application, Aspira was afforded a hearing. After those hearings, the School District denied the applications citing the nonrenewals of Stetson and Olney. *See, e.g.*, Exs. 143, 144 ("It would not be prudent at this time to authorize two new Aspira-managed schools when those allegations *against Stetson and Olney CHS* remain outstanding." (emphasis added)).

Aspira had certain debt that was expected to be refinanced with the condition that the Stetson and Olney charters would be renewed. Without a formal nonrenewal decision, Aspira incurred increased interest costs, forbearance fees, and other costs on this debt. Despite this, there is no language in any document providing for damages for a breach of the charter or contracts.

In September 2019, Aspira filed the Complaint against the School District in the Philadelphia Court of Common Pleas. The School District promptly removed the case to this Court. Aspira alleges it has a contract with the School District to serve as a Turnaround Team for both Stetson and Olney, and that it has a property interest in that contract protected by due process of law. Aspira also alleges it was deprived of its liberty interest in its reputation because the School District made false statements about it and failed to provide it with a name-clearing hearing.

## DISCUSSION AND CONCLUSIONS OF LAW

Aspira has two claims against the School District: (1) breach of contract and (2) violation of procedural due process. *See* Compl. 40–47. Based on the evidence presented at trial, the Court concludes Aspira has not established it has a contract with the School District. Without evidence of a contract, Aspira has also not established it had a protectable property interest for its due process claim. To the extent Aspira's due process claim is based on its reputation or on a stigma-plus theory, the Court concludes the School District did not make sufficiently stigmatizing statements, Aspira does not have a guaranteed right to operate charter schools, and a name-clearing hearing would not result in the grant of its new charter schools. The Court will thus enter judgment in favor of the School District on both claims.

### A.  Breach of Contract

To prevail on a breach of contract claim, a party must prove: (1) the existence of a contract, including its essential terms, (2) a breach of the contract, and (3) resultant damages. *See Meyer,*

*Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. L. Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016). "It is fundamental contract law that one cannot be liable for a breach of contract unless one is a party to that contract." *Electron Energy Corp. v. Short*, 597 A.2d 175, 177 (Pa. Super. Ct. 1991), *aff'd*, 618 A.2d 395 (Pa. 1993). Aspira, the party asserting the contract, has the burden of proving, by a preponderance of the evidence, a contractual relationship with the School District. *See Telwell Inc. v. Grandbridge Real Estate Capital, LLC*, 143 A.3d 421, 427 (Pa. Super. Ct. 2016).

For a contract to exist, all essential elements must be found. *See Johnston the Florist, Inc. v. TEDCO Const. Corp.*, 657 A.2d 511, 516 (Pa. Super. Ct. 1995). The Court must determine "whether both parties have manifested an intent to be bound by the terms of the agreement, whether the terms are sufficiently definite, and whether consideration existed." *Id.*

Initially, there must be a meeting of the minds—meaning the parties must mutually assent to the same thing. *See Schreiber v. Olan Mills*, 627 A.2d 806, 808 (Pa. Super. Ct. 1993). This is typically evidenced by proof of offer and acceptance. *See Mountain Props., Inc. v. Tyler Hill Realty Corp.*, 767 A.2d 1096, 1101 (Pa. Super. Ct. 2001). "In some circumstances, however, '[a] manifestation of mutual assent may be made even though neither offer nor acceptance can be identified and even though the moment of formation cannot be determined." Restatement (Second) of Contracts § 22(2) (1981). In such cases, a contract may be implied in fact by "looking to the surrounding facts of the parties' dealings." *Quandry Sols. Inc. v. Verifone Inc.*, No. 07-097, 2009 WL 997041, at *8 (E.D. Pa. Apr. 13, 2009) (quoting *Ingrassia Const. Co. v. Walsh*, 486 A.2d 478, 483 & n.7 (Pa. Super. Ct. 1984)).

The charters are not contracts between Aspira and the School District. Although they are valid contracts, Aspira is not a party to them. The plain language of the charters state they are

agreements between the School District and each respective charter school. *See* Exs. 1, 2. The only meaning that can be given to the language introducing the parties to the contract on the first page of each charter, is that the named parties are the *only* parties. *See* Ex. 1, at 1 ("This Charter . . . is made and entered into . . . between the School District of Philadelphia . . . and the John B. Stetson Charter School; An Aspira, Inc. of Pennsylvania School . . . ."); Ex. 2, at 1. On that page, Aspira is not mentioned as a party. And although Aspira is mentioned in the introduction paragraph, that is only because each school's incorporated name includes "An Aspira, Inc. of Pennsylvania School." *See* 4:197:22–198:9 (testimony stating the charter school wanted to include Aspira in its name).

Not only is Aspira not a party to the charters, but Aspira is not, by any legal means, the same entity as the charter schools. Each charter school is an independent nonprofit corporation governed by its board of trustees. *See* 24 Pa. Cons. Stat. § 17-1703-A (defining charter schools). Each school was formed, and each school's board was created to hold the respective charter. Aspira is neither the schools nor on the boards for the schools. Importantly, Aspira did not sign the charters on behalf of the charter schools. *See* Tr. 3:34:24–35; *see also Sheller, Ludwig & Sheller P.C. v. Equitrac*, 2008 WL 2370826, at *3 (E.D. Pa. June 9, 2018) (stating entity was not a party to an agreement because neither did the agreement name the entity as a party nor did the entity sign the agreement).

The Court recognizes Aspira is operating these schools and is responsible for making the charters possible. When talking about each school, one is essentially talking about Aspira. As a matter of law, however, Aspira is not the charter school, and the charter school is not Aspira. *See* Tr. 3:35:4–7. And Aspira's representatives acknowledged as much. Regardless of the parties'

conduct before the charters were issued, the Court concludes the charters, on their own, do not prove the existence of a contract between the School District and Aspira.

Regardless of the plain language of the charters, the Court also concludes there was no meeting of the minds between Aspira and the School District to grant the charter to Aspira. By looking at the surrounding circumstances of the School District's grant of the charters, the Court is not persuaded the parties intended to contract. As stated in the findings of fact, both parties were knowledgeable of the charter school model. In many of the School District's own documents, it expressed its intent to enter charter agreements with respective charter schools (and the board of trustees) when Turnaround Teams pursued the charter school model. The Court discredited Calderon's testimony regarding his belief that the charters were contracts between Aspira and the School District.

And even if the Court credited Calderon's belief, the evidence shows the parties did not assent to the same thing. The School District only intended to match the Renaissance Schools with qualified organizations and did not intend to contract with Aspira for a charter school. The evidence supports this conclusion, including:

(1) Chao's testimony regarding the charter school form, structure, and governance;

(2) The School District's Renaissance Initiative Policy, Implementation Plan, and RFPs which state numerous times that charter schools required the formation of a new nonprofit corporation and creation of an independent board of trustees;

(3) The School District's requirement that Turnaround Teams seeking charter schools submit a separate charter school application;

(4) The School District's distinction between the contract school and charter school form, and Aspira's review of the documents stating those distinctions;

(5) Aspira's familiarity with charter schools, its role as a charter management organization, and the requirements to create a charter school;

(6) Calderon's testimony regarding the steps he, on behalf of Aspira, took to incorporate the charter schools and boards; and

(7) The School District's consistent treatment of Aspira as the charter management organization for both Renaissance and non-Renaissance charter schools.

To the extent Aspira relies on the parties' course of dealing to prove a meeting of the minds, the Court concludes the course of dealing is also consistent with there not being a contract between the parties. The evidence of the communications between the parties throughout the performance of the charter is similar to the communications with any charter management organization regardless of the Renaissance Initiative. The School District communicates with Aspira because it manages the charter schools. The School District rightfully directs its concerns with areas of the charter schools to Aspira because Aspira manages most aspects of the schools and the schools request that communications include Aspira. The School District does not communicate with Aspira under the premise of a contract.

The service agreements between the charter schools and Aspira also support the conclusion that Aspira is not in a contract with the School District, nor did it intend to be. The service agreements provide Aspira's payment *from the charter schools* and the School District did not pay for Aspira's services. Aspira's position regarding its contractual obligation to be a Turnaround Team for each charter school is also undermined by its position in the service agreements which provided for termination by either the charter schools or Aspira. The service agreements detail the essential terms of Aspira's services including price, duration, termination, and service schedules. The clear terms of the parties' responsibilities in the service agreements and the absence of any

terms in the alleged agreement between Aspira and the School District show an absence of material terms. In fact, the Court cannot identify what the School District was bound to in the alleged agreement.

The weight of the evidence thus shows neither Aspira nor the School District intended to contract, and importantly, no contract was formed by the issuance of the charters. *See Brisbin v. Superior Valve Co.*, 398 F.3d 279, 293 (3d Cir. 2005) (affirming magistrate judge's conclusion that there was no meeting of the minds when essential terms were not agreed upon).

Turning to the RFQ, RFP, and other exchanged documents, the Court concludes these did not create a contract either. "[I]t is well established that evidence of preliminary negotiations or a general agreement to enter a binding contract in the future fail as enforceable contracts because the parties themselves have not come to an agreement on the essential terms of the bargain and therefore there is nothing for the court to enforce." *ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 666 (3d Cir. 1998) (interpreting Pennsylvania law). And a bidding process, including requests for proposals, does not create a contractual relationship. *See Commonwealth v. On–Point Tech. Sys., Inc.*, 821 A.2d 641, 649 (Pa. Commw. Ct. 2003).

The RFPs only contemplated a future contract (based on chosen school model). *See* Exs. 1-A, 2-A. The RFP language stating the Turnaround Teams would be bound to its terms still did not create a contract because there are no essential terms to which the School District would be bound. The RFPs state, and Aspira conceded (through its representatives' testimony), that the School District was not required to match a school with a Turnaround Team or issue a contract or charter agreement. The lengthy exchange process therefore did not create a contract. *See Jenkins v. County of Schuylkill*, 658 A.2d 380, 383 (Pa. Super. Ct. 1995) (finding there "clearly was no contract" when parties engaged in an RFP process and no contract was entered later).

When interpreting the charters with the RFPs and other incorporated documents, there is still no contract between the School District and Aspira. The interpretation of any contract is a question of law. "In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement." *Humberston v. Chevron U.S.A., Inc.*, 75 A.3d 504, 509–10 (Pa. Super. Ct. 2013) (internal quotation marks and citations omitted). When terms are clear and unambiguous, courts should only examine the writing itself to give effect to the parties' understanding. *See id.* Courts may only construe contracts as written and may not modify the plain meaning through interpretation. *See id.*

In Pennsylvania, when a contract refers to and incorporates the provisions of another document, the documents shall all be construed together. *See Sw. Energy Prod. Co. v. Forest Res., LLC*, 83 A.3d 177, 187 (Pa. Super. Ct. 2013). "[C]lauses in a contract should not be read as independent agreements thrown together without consideration of their combined effects." *Id.* "Terms in one section of the contract, therefore, should never be interpreted in a manner which nullifies other terms in the same agreement." *Id.* While interpreting a contract, specific language in the documents controls the general language or terms. *See id.*

The charters unambiguously incorporate the RFPs, Aspira's responses, and the charter applications.[19] But construing these documents with the charters does not result in an agreement

---

[19] Aspira argues these incorporated documents created the contract between Aspira and the School District. The Court disagrees. These documents support the Court's findings and conclusion that Aspira understood the charter school model and the fact that it did not result in a contract between Aspira and the School District. The RFPs provided for three school models and Turnaround Teams had a choice of which model to pursue. By reading through these documents and submitting a response in which Aspira sought the charter school model, Aspira acknowledged the differences between the models. Aspira did not pursue a contract model which would have resulted in a contract with the School District. Rather, it pursued the charter school model, submitted a charter school application (which was not required for any other school model), and incorporated the charter entity. These incorporated documents establish the model was a charter school and "pursuant to the Charter School Law," the new charter entity would hold the charter. *See, e.g.*, Ex.

between Aspira and the School District. That is because the culmination contract explicitly stated the parties to the charter and did not include Aspira. The incorporation of the exchanged documents only results in holding the charter school accountable for obtaining the standards created for the Turnaround Teams.

The Court recognizes the incorporated documents (at times) contemplate the Turnaround Team entering into and signing an agreement with the School District. *See, e.g.*, Ex. 1-A, at 9. That language, however, does not outweigh the facts of what *actually* happened. Reading the language in these RFPs (which refer to three different school models generally) in the manner Aspira suggests, would nullify the meaning of the culminating charter with the charter schools. Pursuant to the contemplated charter school model, the Turnaround Team did not enter the contract—the charter schools did. The general language regarding Turnaround Teams entering into contracts with the School District is controlled by the specific language describing the charter school model. In this case, the incorporated documents, specifically referring to the charter school model, state the Turnaround Teams were required to incorporate a charter entity to enter the charter. *See, e.g.*, Ex. 1-A, at 9. And Aspira did just that.

In sum, Aspira's breach of contract claim fails because (1) it is not a party to the charters, (2) it has not proven the parties reached a meeting of the minds for any other agreement (or an intent to contract), and (3) in interpreting the plain language of the charter and incorporated documents, there was simply no contract between the School District and Aspira. Without a

---

1-A, at 9 (referencing School District's Renaissance Initiative Policy); Ex. 15, at 3 (describing charter school model and noting agreement would be between charter school and School District).

contract, Aspira cannot prevail.[20] The Court thus finds in favor of the School District and will enter judgment in favor of the School District on Aspira's breach of contract claim.

## B. Procedural Due Process

To prevail under § 1983 for deprivation of procedural due process, a party must prove it (1) was deprived of an interest that falls within the Fourteenth Amendment's protection of life, liberty, or property, and (2) the procedures available to it did not provide due process of law. Aspira asserts a due process claim based on (1) deprivation of its property interest in the charters with the School District, and (2) deprivation of its interest in its reputation based on the stigma-plus theory.

The Third Circuit has recognized the Fourteenth Amendment provides for a property interest in contracts that only allow a contracting state entity to terminate the contract for cause.

---

[20] Assuming there was a contract between Aspira and the School District, the Court also concludes the School District did not breach any terms of the charter (the only agreement Aspira alleges). Aspira's argument is premised solely on the duty of good faith and fair dealing and the School District's alleged bad faith in seeking nonrenewals of the charters. "[E]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Creeger Brick & Bldg. Supply, Inc. v. Mid–State Bank and Tr.*, 560 A.2d 151 (Pa. Super. Ct. 1989) (citing Restatement (Second) of Contracts, § 205). The duty, however, does not compel a party to surrender its rights granted by statute or conferred upon the party by the terms of the contract. *See id.* at 154.

Pursuant to the CSL and the express terms of the charters, the School District was permitted to seek nonrenewal of the charters for material violations of the terms. The School District's decision to seek nonrenewal was thus well within its legal and contractual rights against the charter schools (and Aspira, under the stated assumption that a contract existed with Aspira). Although Aspira contends the nonrenewals were made in bad faith based on Kacer's allegedly false and misleading presentation to the SRC, the Court found Kacer's presentation was at worst, vague. The evidence does not support a finding that Kacer, or the School District, acted in bad faith in seeking nonrenewals of the charters. The Court found Kacer's concern with the charter schools' financial health and compliance was well documented and thorough. Even if her presentation did not provide a complete picture of the PNC loan and any associated risk, it is insufficient to find she and the School Districted failed to act in good faith. The Court thus concludes the School District did not breach the duty of good faith and fair dealing. *See Angino v. Rovner, PC v. Santander Bank, N.A.*, No. 489 MDA 2014, 2015 WL 6405714, at * 5 (Pa. Super. Ct. Jan. 28, 2015) (concluding defendant did not breach covenant of good faith and fair dealing because the contract and governing statutes provided the right to engage in the conduct complained of).

*See Unger v. Nat'l Residents Matching Program*, 928 F.2d 1392, 1397 (3d Cir. 1991). But because the Court has concluded Aspira does not have a contract with the School District, the procedural due process claim based on the contract theory is a nonstarter. The Court thus finds in favor of the School District on this claim.

There is a protected liberty interest in one's reputation, if a party can show a stigma to his reputation plus deprivation of some additional right or interest (a stigma-plus claim). *See Hill v. Borough of Kutztown*, 455 F.3d 225, 236 (3d Cir. 2006). To make a claim, "a plaintiff must show a stigma to his reputation *plus* deprivation of some additional right or interest." *Id.* (emphasis in original). In other words, reputation damage is not actionable unless "it occurs in the course of or is accompanied by a change or extinguishment of a right or status guaranteed by state law or the Constitution." *Clark v. Twp. of Falls,* 890 F.2d 611, 619 (3d Cir. 1989). Stigma-plus claims are common in public employment cases, *see, e.g.*, *Ersek v. Springfield,* 102 F.3d 79 (3d Cir. 1996), but they can also be used in other contexts, *see Baraka v. McGreevey,* 481 F.3d 187, 208–10 (3d Cir. 2007).

To satisfy the "stigma" prong of the test, a plaintiff must prove "the purportedly stigmatizing statement(s) (1) were made publicly . . . and (2) were false." *Id.* (citations omitted). To satisfy the "plus" requirement, a plaintiff must demonstrate that the alleged defamation harming plaintiff's reputation "occurs in the course of or is accompanied by extinguishment of a right or status guaranteed by law or the Constitution." *Id.* at 235.

Kacer's statements at the public SRC meeting do not satisfy the stigma prong because Aspira has not proven they were false.[21] Kacer presented a summary regarding each charter

---

[21] In *Hill*, the Third Circuit stated the stigmatizing statements must be made publicly and be false. *See* 455 F.3d at 236. In another precedential opinion predating *Hill*, the Third Circuit stated allegedly stigmatizing statements must be *substantially* and *materially* false, and "infringe upon

school's nonrenewal recommendation. Her primary concerns were with each school's declining financial health and stability. At the SRC meeting, she gave true statements regarding each school's guarantees on mortgages and loans, including the PNC loan. Both parties presented evidence on the PNC loan and there is no doubt that each charter school was a guarantee on that loan. There is thus no basis for finding Kacer's statements at the SRC meeting false. *See Dondero v. Lower Mildford Twp.*, --F.4th--, 2021 WL 3043372, at *3 (3d Cir. July 20, 2021) (affirming district court's grant of summary judgment because plaintiff provided no evidence the alleged defamatory statements were false); *see also Titterton v. Jenkintown Borough*, No. 20-5869, 2021 WL 2823077, at *7 (E.D. Pa. July 7, 2021) (holding statements were not sufficiently stigmatizing when they only alleged "improper or inadequate performance, incompetence, neglect of duty or malfeasance").

Although Aspira argues Kacer's omission of the value of the Dougherty Campus created a misleading impression, the Court disagrees. Kacer and the CSO's concern with the charter schools' guarantees was premised on the mere existence of the guarantees. Her omission of the value of the mortgaged property was thus not material to why the CSO sought nonrenewal. Kacer also testified that she believed the use of the charter schools' as guarantees was improper under the CSL. *See* Tr. 5:60:4–17; *see also* 24 Pa. Cons. Stat. § 17-1714-A. The value of the Dougherty Campus was

_____

the reputation, honor, or integrity" of the individual allegedly stigmatized. *Ersek v. Springfield*, 102 F.3d 79, 83–84 (3d Cir.1996). These two standards are not entirely inconsistent, but the Court recognizes one may be less onerous than the other. To implicate a liberty interest of constitutional significance, the Court is persuaded the more exacting standard applies and a plaintiff must prove the statements were substantially and materially false. *See, e.g.*, *Lockett v. Pa. Dep't of Corrs.*, 529 F. App'x 294, 296 (3d Cir. 2013) (applying substantially and materially false standard); *Brown v. Montgomery Cnty.*, 470 F. App'x 87, 91 (3d Cir. 2012) (same). The Court need not apply this standard, however, because it concludes Aspira has not proven the statements were at a minimum, false.

not relevant to Kacer's presentation, which was to alert the SRC to the charter schools' acting as guarantees on loans that did not primarily benefit them, which was in violation of the CSL.

Even if Kacer's statements were sufficiently defamatory, the Court concludes Aspira has not proven the "plus" prong because operating a charter school is not a guaranteed right under state law or the Constitution. As an initial matter, Aspira has not been removed as the Turnaround Team or charter management organization for either Stetson or Olney. To date, the charters still exist and Aspira still manages the schools. *See Pasour v. Phila. Hous. Auth.*, 67 F. Supp. 3d 683, 694–95 (E.D. Pa. 2014) (finding no "plus" when plaintiff was not actually removed from position).

Also, the Court concludes operating a charter school, or being granted a charter school, is not a guaranteed right. The School District has discretion to grant or deny a charter school application, filed by Aspira or any other entity. *See* 24 Pa. Cons. Stat. § 17-1717-A; *Tundo v. Cnty. of Passaic*, 923 F.3d 283, 287 (3d Cir. 2019) ("[There is] no protected interest in a benefit if the government has ample discretion to deny that benefit. . . . This discretion need not be absolute. It just has to be enough that there is no mutually explicit understanding that the benefit will continue." (citing *Anderson v. City of Philadelphia*, 845 F.2d 1216, 1221 (3d Cir. 1988))). The CSL provides certain criteria to be considered in evaluating charter school applications. *See id.* But being granted a charter or having a charter application approved, is not a guaranteed right. Aspira's denial of four new charter schools is insufficient to satisfy the plus prong. *See Mun. Revenue Servs., Inc. v. McBlain*, No. 06-4749, 2007 WL 879004, at *5 (E.D. Pa. Mar. 19, 2007) (concluding "plus" prong was not satisfied because "harm to plaintiff's reputation may have had a negative impact on plaintiff's business, [but] this is still properly viewed as the 'stigma' itself and not a change in status sufficient to establish the 'plus'"), *aff'd*, 347 F. App'x 817 (3d Cir. 2009); *cf. Clark*, 890 F.2d at 620 (3d Cir. 1989) ("[P]ossible loss of future employment

opportunities is patently insufficient to satisfy the requirement . . . that a liberty interest requires more than mere injury to reputation.").

And finally, even if Kacer's statements were false and deprived Aspira of a protected right, the Court doubts a name-clearing hearing would lead to the grant of the new charters. The School District was and continues to be troubled by the use of the charter schools' revenues to guarantee loans that were not for the exclusive benefit of each charter school. Regardless of the value of the Dougherty Campus and the other collateral on the loans, the School District was concerned with the guarantees, period. "It was the fact of [the guarantees], not [the terms and value of the loans], that might have injured [Aspira's] reputation." *Ersek*, 102 F.3d at 85. Aspira cannot dispute that it used the charter schools' revenues as security on the loans, and therefore a name-clearing hearing to address that issue would not necessarily lead to the grant of Aspira's new charter applications.[22] *See id.*

Because Aspira has not established its stigma-plus claim, the Court finds in favor of the School District on this claim as well.

**CONCLUSION**

Aspira does not have a contract with the School District to be a Turnaround Team or to operate the charter schools. Not only is there no contract, but the evidence shows neither party intended to contract with the other. Without a contract, Aspira does not have a property interest

---

[22] The Court also notes Aspira has received a hearing on the new charter school applications. Pursuant to § 17-717-A of the CSL, and 53 Pa. Cons. Stat. § 303, Aspira was entitled to public hearings on each charter school application and was permitted to appeal the denial of a charter school application to the CAB. It is undisputed that Aspira had two public hearings on each charter application. *See* Exs. 143, 144, 192, 193. Even though the School District cited the Stetson and Olney nonrenewals as *part* of the basis for denying the new charter applications, those two hearings (or an appeal from the denied application) would have served as an appropriate name-clearing hearing for Aspira to state its position on the nonrenewals and the allegations made therein.

protected by the Due Process Clause. The School District's statements in seeking nonrenewal of the charter schools were not sufficiently stigmatizing to implicate a liberty interest, and even so, operating a charter school is not a guaranteed right in which Aspira has been deprived.

This is not to say that Aspira has not been wronged here. The Court must acknowledge the thin line of which the School District treads in its treatment of Aspira, a reputable organization attempting to provide education and services to the youth of Philadelphia. The School District has avoided liability by deferring to the charter school model, CSL, and focusing on the fact that *as a matter of law*, Aspira and the charter schools are separate entities.

But take note, the School District's position, especially in denying the new charter school applications and in the hearing officer's nonrenewal recommendations, treats the charter schools and Aspira as the same. And to the extent the School District states the nonrenewals were about the charter schools and not Aspira, it is impossible to talk about one without the other. Even though Aspira does not have a contract with the School District, by seeking nonrenewals of the charter schools, the School District effectively discontinues Aspira's ability to manage the charter schools. Without a charter school, Aspira has nothing to manage (and may not manage other charter schools in light of the School District's recent denials of its applications). Considering the practical effect on Aspira of the School District seeking nonrenewal of the charter schools, the Court finds little burden or harm preventing the School District from simply providing Aspira with the name-clearing hearing it seeks. In this circumstance, however, the law does not provide Aspira with this remedy.

Accordingly, the Court finds in favor of the School District on all Counts in the Complaint and will enter judgment in its favor.

An appropriate judgment follows.

BY THE COURT:


 /s/ Juan R. Sánchez
Juan R. Sánchez, C.J